# HERMAN F. DROEGE v. CHRISTINE BROCKMEYER AND ANOTHER.[1]

January 2, 1943.

No. 33,312.

[1]Reported in 7 N. W. (2d) 538.

*Fred Sorenson,* for appellant.
*Joseph P. O'Hara,* for respondents.

JULIUS J. OLSON, JUSTICE.

Action to have defendants declared trustees of certain funds reaching their hands alleged to be the property of plaintiff's in-

testate and for an accounting thereof. Tried to the court, there were findings for plaintiff as to the existence of a trust, and, in addition, that there remained a balance in the trust fund amounting to $630.85, which, with interest from the date of decedent's death, defendants should pay. Plaintiff, being dissatisfied with the amount awarded, moved for amended and additional findings or, in the alternative, for a new trial. That order being denied, he appeals.

Plaintiff's father, Henry Droege, died intestate September 15, 1935, leaving as his sole heirs at law two sons, Herman, the plaintiff, and Edward, and two daughters, defendant Christine and Anna Lykin. Defendant Hugo Brockmeyer is Christine's husband. All the sons and daughters are of mature years, ranging from 50 to 59 years.

On and prior to December 12, 1924, decedent owned a life estate in 80 acres of land, the fee being in his son Edward, who also owned an adjoining 80-acre tract. Decedent held two mortgages given by Edward aggregating $10,000, each bearing interest at five percent. Both mortgages were subject to prior mortgages aggregating $10,000 with some accumulated interest. On that day an oral arrangement was entered into between the father and the son Edward, on the one hand, and Christine and husband on the other, that the father would transfer to Christine the two mortgages owned by him and that he and Edward would convey to Christine the mentioned premises. The purpose of the arrangement was to have the land sold and converted into money as soon as a satisfactory sale could be made so that the proceeds therefrom could be used to take care of the father, who was suffering from an incurable ailment and whose demise might soon occur. All funds not needed for such purpose were to be divided amongst the children in equal parts when the father died. A buyer was found and a sale made on October 5, 1925, the total purchase price being $24,500. At that time there was due and unpaid upon the first two mortgages, with interest, $10,473.50. This was assumed by the purchaser. Out of the cash difference, other debts of Edward

were paid, amounting to $3,334.62; this also pursuant to the orig-
inal agreement. Needed expenses were incurred and paid, such as
taxes, repairs on the farm, interest on a mortgage, and a commis-
sion of $490 on the sale of the farm, representing two percent of
the sale price. These items amounted to $1,323.53. The court ac-
cordingly determined that as of that date there remained in de-
fendants' hands $9,368.35. It is the disbursement of this sum that
affords the bone of contention in the present litigation.

The court allowed defendants a credit of $2,400 for taking care
of decedent from May 1920 to January 1, 1926, deducting $400
therefrom which had been paid by decedent.

From May 1, 1920, until decedent's death, he had resided with
and was taken care of by defendants except for short periods prior
to 1929, when he was taken care of by plaintiff or his daughter
Anna.

In 1922 he became afflicted with "Parkinson's disease (creeping
paralysis), and such affliction progressed gradually until his death."
From 1928 until he died the paralysis became so complete that "he
could not feed himself, dress or undress or even attend to his
ordinary natural requirements without assistance."

For taking care of decedent during the years 1926 and 1927, de-
fendants were credited at the rate of $40 per month. For the years
1928 and 1929, because of his further incapacity, the award was
increased to $75 per month. For the year 1930 and until his
death, they were allowed $90 per month. The court also gave
them credit for $181.50 for "special furniture and equipment"
needed and used for him. Other small credits were given for
medical services and the like. In a carefully prepared summation
from year to year, the final balance first above mentioned was
arrived at.

The court's memorandum establishes beyond question that the
court gave careful consideration to every item going into this
long and difficult period of trust relationship. The court consid-
ered that "this was a rather difficult matter to determine because
evidence in the matter covered a period that went back almost

20 years." Further difficulty arose by reason of the fact that in 1939 defendants suffered a bad fire loss in which most of the books, records, and papers pertaining to this affair were destroyed. Certain remnants were found, and these were utilized at the trial. From all the facts appearing the court became "satisfied that when Henry Droege turned the proceeds of the mortgages over to the defendants, that it was understood, that they should receive out of said funds credit for a reasonable charge for board and room and services, and that if any balance remained that it should be divided among his children at the time of his death. At the time this was done Henry Droege was already a very sick man and probably had little prospect in his own mind of living even as long as he did, which probably also accounts for the fact that more definite arrangements were not made at the time, which would have clarified some of the issues at the time of his death."

With respect to Christine's services and those of her family, the court said that decedent lived with her and her family and re-ceived from them "the most efficient and considerate care. From 1924 on the decedent required a great deal of extra care and attention such as a daughter would not ordinarily have to give to merely an invalid father. After 1928 his condition reached a point where he was practically unable to perform any of the necessary physical functions of existence without help from some member of the Brockmeyer family." He was in need of "constant attention" over a period of more than seven years. He was given "the most affectionate and considerate treatment," and, as a matter of fact, became such a burden that the Brockmeyer family were prevented from the ordinary "enjoyment of their own home and family life. * * * During all this period there was no satisfactory evidence that the other members of the Droege family were very anxious to exchange places with their sister, Christine, and provide the care and treatment that the Brockmeyer family did."

With respect to the interest rate charged against defendants upon the funds entrusted to their care, the court expressed the view that, since the original mortgages turned over to defendants drew

interest at five percent and in 1926 these funds were earning only four percent, defendants should be charged at a five percent rate computed upon an annual basis instead of the legal rate of six percent, for which plaintiff contended. The total amount of interest so charged is $2,218.90.

On this phase finding No. 14 is important. It reads:

"That on the 7th day of November, 1927, the decedent, Henry Droege, signed a written agreement under the terms of which the defendants herein were instructed to deduct such amounts from the trust funds in their control as would compensate them for the care and treatment, personal services, board and room and other items of necessary expense."

And in its memorandum the court, in reviewing the facts, came to the conclusion that "they [defendants] should receive out of said funds credit for a reasonable charge for board and room and services, and that *if any balance remained* that it should be divided among his children at the time of his death." (Italics supplied.)

■ What problems are properly here for review? Plaintiff's blended motion was denied *in toto*. We have repeatedly held that denial of such a motion brings for review only that part of the order denying a new trial. Insofar as the order denied amended or additional findings, no appeal lies therefrom. Hoyt v. Kittson County State Bank, 180 Minn. 93, 94, 230 N. W. 269. Our latest case on this phase is State, by Attorney General, v. Riley, 213 Minn. 448, 7 N. W. (2d) 770. And, as we there held, a denial of that part of the motion (to amend the findings or to make additional findings) amounts to a finding contrary to what the moving party asks for. That is but a restatement of a long line of cases cited in Sheffield v. Clifford, 186 Minn. 300, 306, 243 N. W. 129, 132, where we said: "Where the court refuses to make proposed amendments or changes in the findings, that is equivalent to findings negativing the facts asked to be found." So, also, in Smith v. Benefit Assn. of Railway Employees, 187 Minn. 202, 208, 244

N. W. 817, 819, where we said:

"But where a motion for an amended finding affirmatively or negatively upon such issue is made, a denial of it is the equivalent of a finding contrary to that requested." (Citing cases.) The party "making the motion for a finding and meeting a denial, cannot say that the court did not pass upon the fact."

Our cases are cited in 6 Dunnell, Dig. & Supp. § 9852.

In this situation, then, the only question for review here is whether the evidence sustains the findings challenged as being without support.

■ This was a family arrangement among those immediately interested by blood and marriage. All of them are laymen. To them a trusteeship as defined, practiced, and understood by lawyers or professional trustees was unknown. Their motivating and only purpose was to secure for their old and ailing father the care and comfort of the home he theretofore had occupied and was still occupying with Christine and her family. She was the one from whom all were expecting this service.

We have recited the essential facts found by the court. But, in view of the fact that the credits allowed by the court for care, nursing, and the like constitute the items principally challenged as being without evidentiary support, we deem it necessary to state some additional facts.

Decedent was a large, corpulent man who had weighed well over 200 pounds. As far back as 1921 he could not feed himself with a spoon, nor could he go to the bathroom without someone to help him. That year he fell on the stairway and from that time on became even more helpless. As we have seen, in 1922 he became afflicted with Parkinson's disease, an ailment causing steadily increasing disability. As time went on, we find that he had to get help to get out of a chair; he lost control of his bowels and kidneys; he had to be dressed and undressed and fed and cared for as an infant. In 1928 his condition became so bad that he could not raise his hands to his face. His fingers, half closed, turned in

toward his palms. In hot weather he perspired freely. Someone in the Brockmeyer family would have to tuck paper or linen cloths between his fingers and the palms of his hands. It became necessary to place a towel on the back of his chair and strap it around his head so that his head would be held erect. Later, his tongue was inclined to hang out. He was subject to frequent "accidents" due to the loss of kidney and bowel control. At times, when the weather was hot, he would have to be carried in his chair to the basement to cool off, or to the family car and given a ride for the same purpose. His attending physician who took care of him from 1924 until his death testified that the services of a practical nurse were needed and that the wages of such a nurse were between four and five dollars per day; that the nature of such employment, because of decedent's condition, would require the services of more than one nurse—"one nurse could not do it," since "it would require one nurse in the daytime, and another at night." In speaking of "the largest amount" to be allowed as a credit, i. e., $90 per month, during the last years of decedent's life, the court said:

"Considering the type of care needed by the decedent, this does not seem to be an unreasonable figure. Certainly you would have to pay much more than this at a private hospital, because at some such places he would have needed the constant attention of a trained nurse, a private room, *and even that would not be able to provide the care that he received at the Brockmeyer home.*" (Italics supplied.)

The record leaves no doubt that these allowances are well sustained by the evidence. As a matter of fact, the court might well have found that decedent's entire fund entrusted to defendants' care and keeping was well earned by them for the services they rendered. The record leaves no doubt that this money came to their hands to be used for decedent's benefit. They so used it. During all these years plaintiff and the others interested in their father's care and well-being were, to all appearances, well content

to leave things as they were. Apparently no thought was entertained that defendants were to be charged with interest upon this fund. And this, too, was the thought of plaintiff's intestate when on November 7, 1927, he executed a writing, duly witnessed and acknowledged, where,—

"in consideration of" Christine's agreement "to nurse and care for him *until further and different arrangements shall be made,* [he, decedent] has agreed and hereby does agree to pay" her "for any and all expense that she shall incur" in his behalf, *"and to pay to her for her personal services and assistance,* the reasonable value" thereof when and *"as demanded"* by her. And, "Mr. Hugo Brockmeyer has certain moneys and property belonging to said party of the first part [decedent] in his control and *until further ordered he is hereby authorized to pay out of such funds, such amounts as said party of the second part* [Christine] *may demand for the expense and nursing and care above referred to."* (Italics supplied.)

█ The old father's condition was such that his early demise seemed probable. Obviously, no safe investment payable on demand could have been made at the rate allowed by the court. Safe investments to meet such requirements and to bring this rate of return would be difficult, if not impossible, to find. No "different arrangements" were made. His direction, and the authority granted, to Mr. Brockmeyer remained as written. There is no suggestion made, nor even an intimation of one, that there should be any interest charged. The fund remained the property of decedent, except as lawfully paid to Christine pursuant to the discretionary power given her. Only in the event that "any balance remained" at the time of his death was there to be division among his children.

█ "A trust is the condition which arises when one person * * * is vested with legal title to property for the benefit of another." It "implies two estates or interests—one equitable and one legal." The trustee holds the legal title while the beneficial or equitable interest belongs to the beneficiary. 6 Dunnell, Dig. &

Supp. § 9875, and cases under notes 72 and 73. We think the record discloses without doubt that nothing should *vest* in the children during decedent's lifetime. The fund in Mr. Brockmeyer's hands at that time was, and remained, an open and running account until decedent's death.

■ This case is not at all similar to that of St. Paul Trust Co. v. Kittson, 62 Minn. 408, 65 N. W. 74, upon which plaintiff relies. There the trust company in its capacity of a trustee under a written instrument proceeded to use the trust money as its own. Obviously, this was in violation of its fiduciary duty. Mr. Justice Mitchell, in a specially concurring opinion in which Mr. Justice Canty joined, stated the applicable rule in this form (62 Minn. 419, 65 N. W. 78):

"My view is that, when a court of probate or of equity charges a trustee with interest on the trust fund, it is charged not as interest 'upon a loan or forbearance of money,' but as the measure of profits which he is proved or presumed to have made or is estopped from saying that he did not make, or which he ought to have made, but did not make."

In 2 Scott, Trusts, § 207.1 (at pp. 1108 and 1109), the author, in speaking of the rate of interest to be charged against the trustee where there is a breach of trust, has this to say:

"There is no definite rule determining whether interest should be allowed at the legal rate or at the usual rate of return on trust investments, but the matter is largely within the discretion of the court. In exercising its discretion, the court will consider the character of the breach of trust and the degree of fault of the trustee. Where the breach of trust was not intentional, the courts are inclined to give the beneficiaries only the amount which they would have received had no breach of trust been committed, that is interest at the usual rate of return on trust investments. On the other hand, where the trustee acted in bad faith or intentionally committed a breach of trust, he is ordinarily liable for interest

at the legal rate." Supporting cases are found under notes 6, 7, and 8.

■ Since defendants are not appealing they may not urge error here or attack the decision below. But this does not mean that they are prevented from stressing any sound reason for affirmance. "If the record presents any good reason, even though it is not the one assigned by the trial judge, in support of the decision," defendants may use it. And this is especially so where, as here, "an issue is settled as a matter of law by the record." In such a case " 'this court will determine the question * * * and thereby avoid the delay and expense of a retrial of the issues.' * * * Long ago we adopted the course of determining the merits wherever it could be done with due regard to the limitations arising from the nature of our appellate jurisdiction." Penn A. M. Co. v. Clarkson Sec. Co. 205 Minn. 517, 520-521, 287 N. W. 15, 17.

■ In this case and upon this record, we have no hesitancy in finding that, as a matter of law, defendants have acted in good faith and have exercised honest and efficient discretion in the discharge of all their duties to decedent. Plaintiff, as the representative of his estate, can have no greater rights than those possessed by his father at the time of his death. The trial court gave plaintiff more than we think he should have recovered, but of this he may not complain. Defendants' criticism of the disallowance of many items for which they claimed credit are unavailing since they have not appealed.

We have not overlooked the other assignments of error, many of the picayunish type, but we refrain from discussing them, since each challenged finding is supported by competent evidence.

Order affirmed.