# FARMERS STATE BANK OF FOSSTON v. SIG ELLINGSON AND COMPANY.[1]

November 10, 1944.

No. 33,812.

[1]Reported in 16 N. W. (2d) 319.

*O. E. Lewis* and *George A. Lewis,* for appellant.
*Kelly & LeVander,* for respondent.

PETERSON, JUSTICE.

Plaintiff sued to recover $378.86, the net proceeds of a shipment of livestock consigned by one Christ Christofferson to defendant, which plaintiff claims it is entitled to apply on a draft for $500 in its favor drawn on defendant by Christofferson to raise money to pay for the livestock, the amount of which draft was paid by plaintiff to Christofferson under an agreement with defendant, as modified on May 4, 1940, by the terms of which defendant agreed to pay to plaintiff to apply on such drafts the net proceeds of all shipments of livestock so consigned to it by Christofferson.

Defendant interposed a counterclaim for $16,290 based upon the contract as it was prior to the modification. In substance, its claim was that between September 3, 1935, and May 4, 1940, it advanced to Christofferson, as its agent and trustee, on drafts drawn on it by him money for the sole and exclusive purpose of using the same for the purchase of livestock to be shipped by him to it for sale on commission; that Christofferson placed the proceeds of the drafts in his personal checking account with plaintiff; that he converted and appropriated to his own use $16,665 thereof; and that plaintiff with notice and knowledge participated in the misappropriation by Christofferson.

Plaintiff dismissed the cause of action set forth in the complaint. Thereupon the case went to trial upon the counterclaim.

Plaintiff is a small bank at Fosston. Christofferson resides at Lengby, about eight miles distant, where he is engaged in business as a buyer and shipper of livestock. Defendant is engaged in the business of selling livestock for others on a commission basis at the stockyards at South St. Paul and Fargo. It is a market agency within the meaning of the Packers and Stockyards Act (see, 7 USCA, § 201). Christofferson bought livestock from farmers in the vicinity of Lengby which he paid for with the proceeds of drafts drawn on the commission firms to whom he consigned the livestock for sale.

Because of some differences which he had with the bank at Lengby, he decided to transfer his account to plaintiff at Fosston. Thereupon, on August 28, 1935, after talking the matter over with Christofferson, plaintiff (hereinafter referred to as the bank) wrote to defendant to make an arrangement for cashing drafts drawn by Christofferson. After reciting in the letter that Christofferson desired to open an account with it for the reasons mentioned, the bank stated that if defendant would honor sight drafts drawn on it by Christofferson "whenever needed for his business we [the bank] will credit these to his checking account and he can issue checks in payment of the stock that he buys," and requested defendant to advise whether it would honor such drafts. On September 3, 1935, defendant answered advising the bank "that we have agreed to finance Mr. Christofferson in his livestock purchases and will honor drafts he draws on us for that purpose to the extent of $2,000.00 (two thousand dollars). Any drafts in excess of this amount you can wire us on."

From September 3, 1935, to May 4, 1940, a period of four years and eight months, the bank accepted 259 drafts aggregating $175,155.75. There was some testimony that the bank was to be paid exchange for its services at the rate of ten cents per hundred dollars. It received less than that amount for its services, namely, $135.55. No other compensation was agreed upon or paid. Christofferson deposited the proceeds of the drafts in his personal checking account as the bank's letter of August 28 to defendant contemplated. No arrangement was made or suggested that either Christofferson or the bank segregate the proceeds of the drafts and carry them in an account with Christofferson as agent, trustee, or other fiduciary for defendant. It was Christofferson's practice to go into the country to purchase livestock from farmers, for the payment of which he issued his personal checks. He arranged to have truckers pick up the livestock later and take them to Lengby, where arrangements were made to ship them to defendant at one of the stockyards mentioned. In order to provide funds to pay the checks, Christofferson left with the bank two or three drafts on defendant,

signed by him as drawer, with the amount in blank, with directions to the bank to fill them in in a sufficient amount to meet the checks when presented. All the livestock, except two shipments to defendant at the stockyards at Fargo, was shipped to it at the stockyards at South St. Paul. There the livestock was weighed, inspected, graded, and sold by defendant as Christofferson's agent. Defendant charged Christofferson, as his agent, with sales expense such as yardage, feed, weighing, insurance, inspection, and selling commissions and credited him with the balance as a charge against the drafts.

Almost from the beginning, the amounts of the drafts and those for the livestock purchases did not correspond. Most of the drafts were drawn for round sums such as $300, $500, $600, $800, and so on, and exceeded the amounts for which livestock shipped was sold. The amounts realized from the shipments were for odd sums such as $891.15, $1,142.56, $1,442.72, and so on. Because the amounts of the drafts and those for the shipments did not correspond and because the drafts were for amounts exceeding those for which livestock shipped was sold, it must have been obvious, as it is conceded the fact was, that the drafts were not being drawn for the actual amounts expended by Christofferson for livestock purchases. In less than six months Christofferson became indebted to defendant for a substantial amount in excess of the amounts due him for livestock shipments. By March 1937 (a year and a half after the arrangements were made), Christofferson's overdrafts exceeded $3,100. Thereupon, defendant took Christofferson's note for the amount owing, payable in one year, as evidence of the debt. This was done without notifying or consulting the bank or warning it not to continue the prior course of business. Defendant's president testified that at the time it took the note it did not know that Christofferson used any of the proceeds of the drafts for purposes other than the purchase of livestock and supposed that he had lost money in his business. This testimony was contrary to the plain fact that was apparent to all, namely, that the amounts of the drafts and those expended for livestock shipments did not corre-

spond and that the amounts of the drafts exceeded the amounts realized from sales of the livestock shipped.

On September 25, 1937, while the note was still unpaid, the bank by letter called defendant's attention to its failure to pay a draft. Defendant answered, explaining the delay and reaffirming the arrangement to honor drafts notwithstanding the fact that the amounts of the drafts and those for livestock shipments did not correspond and that Christofferson had drawn in excess of the amounts realized from the shipments of livestock.

The note was not paid at maturity. Later, defendant's president, while at Lengby, made arrangements with Christofferson to accept half the note if defendant got security. Pursuant to that arrangement, defendant on December 17, 1938, sent Christofferson a note for half the amount of the note of March 1937, together with a mortgage on Christofferson's home in Lengby to secure payment thereof, for his and his wife's signature. Christofferson and his wife signed the note and mortgage and returned them to defendant. The bank was not notified of this transaction nor was any demand made upon it to pay the amount of Christofferson's overdrafts. In fact, the arrangement for honoring drafts continued as before until May 4, 1940 (an additional year and four months). On that date defendant discovered that one Clarke, its bookkeeper, had embezzled money from it through manipulation of customer accounts, including Christofferson's. Apparently, when the note and real estate mortgage were given in December 1938, Christofferson claimed credit for $800, the proceeds of war risk insurance, which he paid to defendant, but this was not taken into consideration in making the settlement. Apparently, the trial court, however, allowed him credit for this item.

During the period in question (from September 3, 1935, to May 4, 1940), Christofferson deposited in his personal checking account not only the $175,155.75, the proceeds of the drafts, but also $13,357.55 derived from his meat market and fur-buying business at Lengby, a total of $188,513.30. Out of the account, he paid the expenses of his livestock, meat market, and fur-buying businesses,

his personal expenses, and some small accounts owing by him to the bank. Apparently Christofferson's wife, as well as he, drew some of the checks. The bank's cashier testified that he knew the purposes for which the checks were drawn. Despite this knowledge, the bank never inquired of Christofferson whether he was using the proceeds of the drafts for purposes other than the purchase of livestock. Apparently defendant abandoned the claim that Christofferson was its agent. The trial court found that Christofferson was a trustee of the proceeds of the drafts; that, because the bank had knowledge and notice of the trust and that some of the checks were drawn for purposes other than the purchase of livestock, it was charged with notice of the purpose for which every check was issued, with the consequence that it was a participant in Christofferson's misappropriations of the amounts of the checks issued for purposes other than the purchase of livestock, and that the bank was liable to defendant, after making certain allowances and deductions not here material, in the sum of $10,837.70.

The bank appeals.

With the claim that Christofferson was defendant's agent out of the case, the remaining questions are whether he was a trustee of the proceeds of the drafts for the benefit of defendant, and, if so, whether the bank participated in the alleged misappropriations by him claimed to constitute breaches of trust. The bank claims that the relationship between Christofferson and defendant was that of debtor and creditor, not trustee and beneficiary. No claim is made that the bank was a trustee for defendant. Since defendant's case is bottomed upon the proposition that Christofferson was its trustee, decision must be against it if he was not.

■ An express trust, as distinguished from a resulting or a constructive one, involves the separation of the legal and beneficial interests in a thing or *res,* as it is called, whereby the legal interests in the trust *res* are held by a person, the trustee, for the benefit of another, the beneficiary, who has an equitable interest in the *res* to receive whatever benefits he is entitled to therefrom by the terms of the trust. Droege v. Brockmeyer, 214 Minn. 182, 7 N. W. (2d)

538; First Trust Co. v. Northwestern Mut. L. Ins. Co. 204 Minn. 244, 283 N. W. 236; Julian v. Northwestern Trust Co. 192 Minn. 136, 255 N. W. 622. Under our statute, the trustee has the whole legal title and estate; the beneficiary a chose in action, consisting of the right to enforce in equity performance of the trust. First and American Nat. Bank v. Higgins, 208 Minn. 295, 293 N. W. 585; Whiting v. Hudson Trust Co. 234 N. Y. 394, 138 N. E. 33, 25 A. L. R. 1470. A debt is a contractual obligation of one person to pay a fixed sum of money to another. McCrea v. First Nat. Bank, 162 Minn. 455, 203 N. W. 220; 26 C. J. S., Debt, pp. 2 and 3. The difference between a trust and a debt, insofar as concerns the beneficiary and the creditor as the parties to whom are due performance of the obligations arising out of the trust and debt respectively, lies chiefly in the fact that the beneficiary of a trust has a beneficial interest in the trust property and the creditor has merely a personal claim against his debtor. A debt is not a trust and involves no fiduciary relationship or duty. Restatement, Trusts, § 12.

Whether a debt or trust was created as the result of a particular transaction depends upon the manifested intention of the parties. Walz v. State Bank, 211 Minn. 317, 1 N. W. (2d) 375. The applicable rule for ascertaining such intention where one person pays money to another is:

"* * * If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created. If the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created." Restatement, Trusts, § 12, *comment g.*

The relationship between the parties here was created by the exchange of letters between the bank and defendant. Therefore, the intention of the parties as disclosed by the letters should be ascertained. The bank's letter to defendant was in effect an offer to accept the drafts and credit the proceeds to Christofferson's per-

sonal checking account. Defendant's letter was an acceptance of the offer, to the effect that it had agreed to finance Christofferson's livestock purchases and would honor drafts for that purpose. The rule is that an acceptance of an offer results in a contract. Where an acceptance is upon condition, it is a rejection of the offer. Where the parties proceed with performance in accordance with a conditional acceptance, the condition is adopted as part of the contract between the parties. Johnson v. M. J. O'Neil, Inc. 182 Minn. 232, 234 N. W. 16; M. Samuels & Co. v. Zorbas, 182 Minn. 345, 234 N. W. 468. The terms of the acceptance, whether conditional or otherwise, relate entirely to contractual relations between Christofferson and defendant.

The letters betoken an intention to create a debt, not a trust. First, there is an entire absence in the letters passing between the bank and defendant of any express language for the creation of a trust. An express trust is one that is created by act of the parties. While the word "trust" need not be used in the instrument creating a trust, the language must be such that the essentials of a trust appear clearly. To constitute an express trust, there must be a designated trustee, a designated trust *res,* and a designated beneficiary. In addition, the rights and duties of the parties must be defined. Where all these essential elements appear, there is an express trust, even though the word "trust" is not used. Here, without determining whether the other elements of an express trust are present, it is sufficient to hold that there is an entire absence of any provision in the letters segregating the proceeds of the drafts as a trust *res.* Where money paid to another is not required to be segregated by the payee and held as a separate fund for the benefit of the payor, there is no trust. Hjelle v. Veigel, 169 Minn. 173, 210 N. W. 891.

The language of the bank's letter contemplated not only an ordinary debtor-creditor relationship between Christofferson and defendant, but a commingling of the proceeds of the drafts with Christofferson's other funds so that there was no segregation thereof as a trust *res.* Ordinarily, where a consignor draws upon his con-

signee, with whom he does not have at the time funds for payment of the draft, and the parties contemplate that the draft shall be paid out of the proceeds of the goods shipped, the consignor upon acceptance of the draft by the consignee becomes indebted to him for the amount thereof. Thereupon the relation of the parties is that of debtor and creditor. The liability of the consignor, as drawer, to the consignee, as drawee, does not rest upon the draft, but upon an implied obligation to indemnify. Griffith v. Reed & Dixson, 21 Wend. (N. Y.) 502, 34 Am. D. 267; Turner Wilson & Co. v. Browder, 3 Ky. Op. 181. The bank stated that it would *credit* the proceeds of the drafts to Christofferson's bank account. Its undertaking to credit Christofferson's account with the proceeds of the drafts clearly connotes a loan from defendant to Christofferson. Walz v. State Bank, 211 Minn. 317, 1 N. W. (2d) 375, *supra.* Under the circumstances, no other meaning can be attached to the language.

By crediting Christofferson's account with the proceeds of the drafts, the same were commingled with Christofferson's other funds on deposit with the bank; or, more accurately, it should be said that the bank credits arising from the proceeds of the drafts were commingled with Christofferson's other bank credits, to be disbursed by him upon checks drawn not as trustee for defendant, but in his own right, the same as the other bank credits possessed by him. Where the depositor of cash consents to commingling it with other funds of the depositee, the relationship resulting from the transaction is not that of trustee and beneficiary, even though the deposit is for the latter's benefit, but that of debtor and creditor. Shoemaker v. Hinze, 53 Wis. 116, 10 N. W. 86. We held in Furber v. Barnes, 32 Minn. 105, 19 N. W. 728, that where the money is kept intact the transaction is a bailment. Ordinarily, where money is deposited in a bank, the relation between the bank and the depositor is that of debtor and creditor. A deposit constitutes a loan by the depositor to the bank. The bank's obligation is to pay the checks drawn on the depositor's credit. That is the universal understanding between banks and their depositors arising from the

customs of trade. Wasgatt v. First Nat. Bank, 117 Minn. 9, 134 N. W. 224, 43 L.R.A.(N.S.) 109, Ann. Cas. 1913D, 416. Money deposited in a bank to be commingled with its other funds loses its identity. The depositor becomes the owner of a bank credit and ceases to be the owner of the deposit. Rodgers v. Bankers Nat. Bank, 179 Minn. 197, 229 N. W. 90. The fact that the deposit is to be used for the benefit of the depositor does not change the relationship between the parties. Vining Co-op. Creamery Assn. v. Peyton, 192 Minn. 68, 255 N. W. 252 (a special account to take care of plaintiff's running expenses); Campion v. Village of Graceville, 181 Minn. 446, 232 N. W. 917 (moneys belonging to village sewer fund); Campion v. Big Stone County Bank, 177 Minn. 51, 224 N. W. 258 (money deposited in account designated "Village of Graceville [Street and Well Fund]" with understanding that the money deposited was to be used only for the purpose indicated); McKee (McKey) v. Paradise, 299 U. S. 119, 57 S. Ct. 124, 81 L. ed. 75; Re Interborough Consol. Corp. (2 Cir.) 288 F. 334, 32 A. L. R. 932; 1 Scott, Trusts, § 12.2. As said in Union Guardian Trust Co. v. Emery, 292 Mich. 394, 418, 290 N. W. 841, 851, in holding a bank deposit commingled with other funds of the bank not a trust fund: "Unless the deposit is segregated, there is no trust."

By consenting to the deposit of the proceeds of the draft to Christofferson's account in which he carried his personal funds, defendant in effect agreed that the bank should become the owner of the funds and that it should give him a credit therefor as part of his other credits, with the consequence that the proceeds of the draft were commingled with the other credits which Christofferson had in the bank so as to become part of his personal account with the bank. In short, defendant agreed to an arrangement whereby Christofferson was not required to segregate the proceeds of the deposits as a separate fund to be held by him for its benefit. The commingling of the bank deposits precludes any trust relationship with respect thereto. Killoren v. First Nat. Bank (8 Cir.) 127 F. (2d) 537.

Defendant's letter to the bank first states that it had agreed to *finance* Christofferson's livestock purchases. *To finance* a business means *to loan* money to be used in conducting it. The Fred G. Clark Co. v. E. C. Warner Co. 188 Minn. 277, 247 N. W. 225; Hobgood v. Ehlen, 141 N. C. 344, 53 S. E. 857; State v. Walla Walla Fruit Growers, Inc. 140 Wash. 94, 248 P. 54. The agreement to finance Christofferson's livestock purchases plainly meant that defendant had agreed to loan Christofferson money to carry on that business. The statement in defendant's letter that it had agreed to honor drafts *for that purpose* clearly means the purpose stated, *viz.,* that of loaning money to Christofferson to conduct his business. A loan creates a debt, not a trust. The obligation of the borrower is personal and contractual. It is one to repay. The lender parts with the entire legal and beneficial interest in the money loaned in exchange for the borrower's personal obligation to repay. Like any other debtor, he has no beneficial interest in the money with which he parted.

It thus seems clear from both letters that only a debtor-creditor relationship and not a trust was intended by the parties.

If there can be any doubt whether the parties intended that Christofferson and defendant should sustain to each other a debtor-creditor rather than a trustee-beneficiary relationship, the doubt is set completely at rest by the practical construction which the parties placed on their transactions.

"* * * Where the language of the parties does not clearly show their intention, all the circumstances must be considered in order to determine whether a debt or a trust was intended." 1 Scott, Trusts, § 12.2, p. 87.

The rule of practical construction is resorted to to make clear what the language of the writing has left in doubt. Leslie v. Minneapolis Teachers R. F. Assn. 218 Minn. 369, 16 N. W. (2d) 313. Parties to written instruments "may adopt their own interpretation of obscure or doubtful provisions and as between themselves render clear and certain what their language has left in ambiguity."

First and American Nat. Bank v. Higgins, 208 Minn. 295, 319, 293 N. W. 585, 597, *supra*. It was obvious to all concerned from the very beginning that the amounts of the drafts did not correspond with the amounts of Christofferson's livestock purchases and that the amounts of the drafts exceeded the amounts realized from the livestock shipped. It was apparent that the money drawn in ex-cess of the value of the livestock shipped was being appropriated by Christofferson for purposes other than the purchase of livestock. The failure of Christofferson to apply the entire proceeds of the 259 drafts drawn over a period of about four and a half years—an aver-age of at least one a week—to the purchase of livestock strongly suggests that he was authorized to deal with the funds as his own money, as money lent to him, rather than that he was the trustee thereof, bound to apply the same for the purposes of the trust here asserted. Furthermore, defendant dealt with Christofferson throughout upon a debtor-creditor basis. As his agent, it charged him with selling expenses, including a commission, and credited him with the balances realized from the sales of livestock which he shipped to it and which it sold on his account. In their business relations there was no suggestion of any trust.

The failure of defendant to assert any trust when it made the first settlement with Christofferson, about a year and a half after they entered upon their business relations, by taking his note for $3,100 for overdrafts, is persuasive evidence that there was no trust. It must have been apparent then, as it was later, that Christofferson was without means to pay and that the bank, if de-fendant's present claim is tenable, could be compelled to pay. The next step, about a year and a half later, was defendant's compro-mise of its claim against Christofferson for half its face in order to get security. It is unreasonable to believe that defendant threw off half the claim as uncollectible because it was without security when it could have collected the whole amount from the bank. These settlements were made without any demand of any kind upon the bank to pay and without even consulting it. The plain infer-ence is that defendant deemed its only recourse to be the personal

obligation of Christofferson to indemnify it, which it attempted to enforce; that it did not regard the bank as being in any way involved; that Christofferson was not a trustee of the proceeds of the drafts; and, consequently, that the bank had not participated in any breach of trust by him as now claimed. The course of dealing between the parties clearly shows that a debt was intended and entirely negatives the existence of any trust.'

Nor is the bank liable for failure to see that Christofferson applied the proceeds of the drafts as he agreed. See, Campion v. Big Stone County Bank, 177 Minn. 51, 224 N. W. 258, *supra*. The obligation to apply the funds to the purposes of Christofferson's business was a purely contractual one between him and defendant. A bank's obligation does not comprehend supervision of withdrawals by its depositors. Rodgers v. Bankers Nat. Bank, 179 Minn. 197, 229 N. W. 90, *supra*. It is preposterous to believe that the bank assumed any such obligation for the compensation which it received, ten cents exchange per hundred dollars, or $135.55 in all. Of course, a bank may become liable for a trustee's diversion or misappropriation of funds deposited by him as trustee by participating in the wrong or by paying out funds in violation of instructions from its depositor, as suggested in the Big Stone County Bank case.

Numerous cases have been cited to us in which a trust has been sustained. Among them are such cases as Village of Monticello v. Citizens State Bank, 180 Minn. 418, 230 N. W. 889; Pierson v. Swift County Bank, 163 Minn. 344, 204 N. W. 31; and Stein v. Kemp, 132 Minn. 44, 155 N. W. 1052. It is sufficient to say that in these cases the deposits were segregated to be applied for a specific purpose and were not to be commingled with the bank's other funds to be disbursed by the depositor as his own funds. Other cases are cited involving deposits by trustees where the bank participated in the trustees' misappropriations. Such cases are clearly not in point. We do not deem it necessary to enumerate them.

Since there was no trust in this case, there must be a reversal. The bank is entitled to judgment as a matter of law.

Reversed with directions to enter judgment on the counterclaim in favor of plaintiff.

