## EVELETH TACONITE COMPANY v. MINNESOTA POWER AND LIGHT COMPANY.

221 N. W. 2d 157.

August 9, 1974—No. 44373.

*Applequist, Donovan, Larson, Barnes, Mathias & Magie, Charles T. Barnes,* and *Robert H. Magie III,* for appellant.

*Reavill, Neimeyer, Johnson, Fredin, Killen & Thibodeau* and *Joseph B. Johnson,* for respondent.

Heard before Otis, Peterson, MacLaughlin, Scott, and Knutson, JJ., and considered and decided by the court.

MacLaughlin, Justice.

Plaintiff, Eveleth Taconite Company, commenced a declaratory judgment action to determine its rights under two electric power contracts with defendant, Minnesota Power and Light Company. The trial court, sitting without a jury, found that the contracts had terminated and that defendant was under no further obligation to provide electric service to plaintiff under the contracts. We affirm.

Plaintiff, a Minnesota corporation with its principal place of business in Eveleth, was created for the purpose of mining taconite ore and processing taconite pellets for use in the steel industry. Eighty-five percent of its outstanding stock is owned by Ford Motor Company, and 15 percent by Oglebay Norton Company, which is also its managing agent.

Defendant, with its principal place of business in Duluth, is engaged in the business of an electric power utility, furnishing service primarily to consumers in the northeastern section of Minnesota.

On October 2, 1964, after extended negotiations, plaintiff and defendant entered into two separate electrical service contracts. One contract called for defendant to provide all necessary electric power to plaintiff's Thunderbird mine, located near Eveleth, and the other called for defendant to provide all necessary electric power to plaintiff's Fairlane plant, located 10 miles from the mine. The term of the mine contract was 3 years, while the term of the plant contract was 5 years. At the time of the negotiations, defendant preferred contracts of at least 10 years' duration because of the substantial cost of adding the new generating equipment and the new transmission and substation facilities necessary to furnish service. Plaintiff, on the other hand, wanted a 3-year contract, but agreed to a 5-year contract for the plant and a 3-year contract for the mine.

Both agreements, in supplements added thereto, contained cancellation provisions. The mine contract provided:

"Service will be for a term beginning with commencement of service hereunder, not later than April 20, 1965, and ending April 20, 1968 and continuing thereafter until effective notice of cancellation shall be given as hereafter provided. Either party may cancel this agreement on April 20, 1968 or on any date thereafter by written notice to the other delivered at least one (1) year prior to April 20, 1968 or prior to such later specified date of termination."

The cancellation provision of the plant contract provided:

"Service will be for a term beginning with commencement of service hereunder, not later than September 20, 1965, and ending September 20, 1970 and continuing thereafter until effective notice of cancellation shall be given as hereafter provided. Either party may cancel this agreement on September 20, 1970 or on any date thereafter by written notice to the other delivered at least three (3) years prior to September 20, 1970 or prior to such later specified date of termination."

Also contained in the supplement to both agreements was a provision referred to by the parties as a "most favored nations clause." This clause is identical in both contracts and provides:

"Company [defendant] agrees that, if at any time *during the term of this agreement* it has in effect an agreement which gives or grants to any other customer; similarly engaged in the taconite industry and who receives the same class and type of electric service as Eveleth Taconite Company, more favorable treatment for the purchase of said electric service or otherwise *gives or grants* to any such customer *more favorable price, terms or conditions* with respect to said other customer's purchase of said electric service, Company shall notify Eveleth Taconite Company in writing with respect to said more favorable treatment, price, terms or conditions and said Eveleth Taconite Company, at its election, may request company to substitute for this agreement such more favorable agreement in its entirety or on an equivalent basis to amend this agreement to give effect to such substitution." (Italics supplied.)

The cost of providing electric service under both contracts was originally established according to defendant's rate schedule 78. However, because of the increased cost of providing electric power, the contracts were subsequently modified by the parties to rate schedule 79, and finally to rate schedule 789. Both of the latter schedules contained increases in the price of the electric power provided by defendant.

Subsequent to entering the electric power contracts with plaintiff, defendant entered into similar contracts with other taconite producers, namely, United States Steel for its Minntac plant near Virginia, and for two plants (the Butler and National plants) operated by the Hanna Mining Company. The contracts with both companies were for a period of 10 years, with the commencement and termination dates as follows: (a) United States Steel Minntac plant, November 26, 1967, to November 26, 1977; (b) Hanna Butler plant, September 20, 1966, to September 20, 1976; and (c) Hanna National plant, January 20, 1967, to January 20, 1977. The two Hanna contracts also contained the most-favored-nations clause.

While the electric power agreements between plaintiff and defendant were in effect, the terms and conditions of the agreements were the same as those with the other taconite companies with the exception of the termination dates. The only changes that were made in any of the contracts between defendant and the taconite producers were those involving rate schedules, and such changes were uniformly made in all contracts.

On April 9, 1969, defendant, pursuant to the cancellation provisions of the contracts, gave written notice to plaintiff that the electric power contract for the mine would be cancelled on April 20, 1970, and the contract for the plant would be cancelled on April 20, 1972.[1]

After receipt of the cancellation notices, plaintiff insisted that the most-favored-nations clause in its contracts with defendant entitled it to the same contract termination date as that con-

---

[1] Plaintiff contends that at no time prior to receiving the notices of cancellation was it aware of defendant's contracts with United States Steel and Hanna Mining Company. However, one of plaintiff's own witnesses, an assistant vice president of Oglebay Norton Company, plaintiff's managing agent, testified that he knew as early as 1967 that defendant had entered into 10-year contracts with the other taconite companies. This information had been supplied to the witness by defendant's division manager, and plaintiff does not seriously argue to the contrary.

tained in the longest contract defendant had entered with the other taconite producers, i.e., November 26, 1977, as provided in the United States Steel contract.

Defendant's continuing contracts with both United States Steel and Hanna are currently at rate schedule 789 for all of their power requirements up to certain peak kilowatt demands set out in those contracts. For any requirements in excess of the peak kilowatt demand, United States Steel and Hanna are on rate schedule 70, which is at a rate 18 percent higher than rate schedule 789. Since the termination of plaintiff's contracts, its total electric power requirement has been billed by defendant under rate schedule 70, thereby considerably increasing the total cost of the electricity used by plaintiff.

If plaintiff, through the most-favored-nations clause, is successful in extending the duration of its contracts with defendant to that of the longest term of the other similar contracts, it will obviously mean a substantial saving in its cost of electricity over the next several years because plaintiff will then also be entitled to continue under the lower rate schedule provided in the United States Steel and Hanna contracts.

The issue, then, is whether plaintiff is entitled to extend the duration of its contracts with defendant, based upon the United States Steel Minntac contract, because of the most-favored-nations clause.

This court has never had occasion to interpret a so-called most-favored-nations clause. Further, we have not found, and the parties have not called to our attention, a case in any jurisdiction interpreting the clause on an issue similar to the one in this case. However, this lack of precedent has little significance because it is clear to us that the decision in this case must turn on ordinary rules of contract construction.

The cardinal purpose in construing a contract is to ascertain the intention of the parties as expressed by the language used. Employers Lia. Assur. Corp. v. Morse, 261 Minn. 259, 111 N. W. 2d 620 (1961); Lowry v. Kneeland, 263 Minn. 537, 117 N. W.

2d 207 (1962); Koch v. Han-Shire Investments, Inc. 273 Minn. 155, 140 N. W. 2d 55 (1966). The process of ascertaining the intention of the parties requires a construction of the contract as a whole rather than a dissection of the contract in which the words and phrases are isolated from their context. Employers Lia. Assur. Corp. v. Morse, *supra.* In construing the contract in its entirety, the court must consider it in the light of the subject matter, the object and purposes of the parties, and the natural meaning of the language used in order to harmonize the various provisions and to unite them into a consistent agreement. Independent School Dist. No. 877 v. Loberg Plumbing & Heating Co. 266 Minn. 426, 123 N. W. 2d 793 (1963).

It seems obvious that the primary purpose of including the most-favored-nations clause in the contract was to ensure that plaintiff would pay the same electric power rate as its competitors under similar contracts. However, plaintiff contends that it is entitled to the benefit of any more favorable provision in any electric service contract which defendant enters with other taconite companies during the term of its contract, specifically including the period of duration of the contract. It asserts that the term of the United States Steel contract is such a provision because that term would, in turn, allow plaintiff to obtain its electric power requirements at the lower rate contained in the United States Steel contract.

Defendant, on the other hand, denies that the phrase "more favorable price, terms or conditions" contained in the most-favored-nations clause encompasses the term or duration of the contract itself. In other words, while it concedes that other more favorable provisions would be read into the contract during its continuation, the parties did not intend that the length of the contract would be extended because of the clause. Defendant argues that the phrase "terms or conditions" contained in the clause is not intended to include the word "term," as applied to the length of the contract.

Defendant cites Hurd v. Whitsett, 4 Colo. 77 (1878), a case

which distinguished the words "terms" and "term." The Hurd case interpreted a Colorado statute concerning month-to-month leases of real property which provided that a landlord, upon giving written notice to a tenant at least 15 days prior to the end of the month, could change the terms of the lease agreement effective at the end of the month, and that such notice would effectively "create and establish as a part of the lease or agreement the *terms and conditions specified* in said notice." (Italics supplied.) 4 Colo. 83. The landlord, by written notice, attempted to change the term of the lease from month to month to 1 year. In discussing the meaning of the words "terms" and "term," the Colorado court stated (4 Colo. 84):

"* * * The word 'terms' in the plural form, in its restricted and legal sense, and as used chiefly in reference to contracts, means the conditions, limitations and propositions which comprise and govern the acts which the contracting parties agree expressly or impliedly to do or not to do. As employed in respect to leases, the word 'terms' embraces the covenants and conditions which impose, confer and limit the respective obligations and rights of the landlord and tenant during the continuance of the tenancy; such as the extent and manner of the use of the premises; quiet enjoyment; rent and its amount, mode and time of payment; repairs; payment of taxes, and the like express or implied agreements.

"* * * The word 'term' when used in respect to tenancies has in law a distinct and technical definition, signifying time, duration, and it means not only the limitation of the estate granted as to time; *e.g.*, for life, for years, for a year, a month and the like, as may be specified in the lease; but it signifies the estate also, and interest that passes by the lease."

In concluding that a change in the duration of a lease was not contemplated by the statute, the court said (4 Colo. 89):

"We conclude * * * that these words 'term' and 'terms' cannot

legitimately be used synonymously; that they are not generic in their relations to each other, but have each a technical and specifically distinct meaning as applied to estates in the nature of tenancies. True, the words are both derived from the latin *terminus,* a limit or boundary; but their application is nevertheless technically distinct; 'term,' meaning in brief a limited estate; and 'terms,' the limitations in the use of that estate arising out of the covenants and conditions thereto annexed."

While we reject any invitation to define the meaning of "terms or conditions" in the context of whether it includes the "term" or duration of the contract in all fact situations, we adopt the reasoning of the Hurd case for the purpose of deciding the issue in this case. In our judgment, there is little doubt that the parties intended that the most-favored-nations clause would protect plaintiff from being placed in a noncompetitive position by provisions in its contracts with defendant, including the price of its electricity, which were less advantageous than provisions its competitors might be granted by defendant at a later time during the agreed-upon span of plaintiff's contracts. We do not believe that the period of duration of the contract was intended to be included in the phrase "terms or conditions" because to do so would create a situation in which the contract could be indefinitely extended at plaintiff's election if defendant continued to enter contracts with other taconite companies. In other words, these contracts would be perpetual if defendant entered other agreements with taconite producers because plaintiff, if it so chose, could continually assume the longer term of those contracts. That result appears inconsistent with the intent of the parties, particularly in light of the evidence concerning the precontract negotiations in which plaintiff successfully resisted defendant's preference for a 10-year contract. In addition, the fact that the most-favored-nations clause uses the two separate phrases, "term" and "terms or conditions," in different parts of the clause and in different contexts, gives further evidence that the parties intended those words to have different meanings. Considering the

contracts as a whole, and having in mind the object and purposes of the parties in entering the contract, we hold that the phrase "terms or conditions," as used in the most-favored-nations clause, was intended by the parties to mean the covenants and provisions of the agreement other than its duration, and that the word "term" has a distinct meaning signifying the period of duration of the contract during which more favorable terms and conditions could, upon the election of plaintiff, be substituted into the agreement.

Therefore we agree with the reasoning and decision of the trial court and affirm its judgment.

Affirmed.