ALBERT BERG AND OTHERS v. ALFREDA BERG.
ELFRIDA BERG v. FARMERS SECURITY STATE BANK OF
ZUMBROTA AND ANOTHER.[1]

November 5, 1937.

Nos. 31,318, 31,319.

[1]Reported in 275 N. W. 836.

*Thomas Mohn* and *Horace W. Mohn,* for appellant.
*A. J. Rockne* and *M. C. Rockne,* for respondents.

JULIUS J. OLSON, JUSTICE.

We have two cases to review, both having been tried together below and so submitted here. Appellant in each case is the widow of one Ole A. Berg, deceased. The respondents are, in the first case, the administrator of the estate of said deceased and the latter's children; in the second case the only respondent here is the administrator, defendant bank being a stakeholder only, and as such in no way concerned with regard to the outcome of the litigation. Hereafter we shall refer to the appellant as the widow and to respondent as administrator. The respective interests and rights are represented by these two in both cases.

The widow and Berg on or prior to December 22, 1923, had agreed to become husband and wife. On that day they repaired to

the office of an attorney in whom both had the utmost confidence, and undoubtedly this was entirely justified. An antenuptial contract was entered into, drawn by their attorney, under the terms of which and "for the purpose of fixing the property rights of the heirs and children by the former marriages of both parties hereto" they agreed in substance as follows: Each surrendered to the other all interest in any estate that the other might leave except that in any event the estate of Mr. Berg was to pay the widow $3,000 within 60 days after his death. This right was to be absolute so that even if she predeceased him that sum of money should go to her heirs, her children by a former marriage. In the event of her survivorship she was to have a life estate in Berg's homestead in the village of Zumbrota, and she was also to have the household goods and certain other articles such as chickens, an automobile, and other items then on the homestead. She bound herself to keep the homestead property insured, agreed to pay the taxes thereon, and to keep the buildings in reasonable repair. To secure the $3,000 payment, Mr. Berg, on the same day, executed a mortgage to his intended wife upon his farm of 140 acres. The mortgage was duly recorded and delivered to her, and she has had possession of the same ever since. On the following day, December 23, Mr. Berg executed a deed to this farm to his children by his former marriage, subject to the mortgage, which the grantees assumed and agreed to pay "according to the terms" of the antenuptial contract; also reserving to himself a life estate therein. After these instruments had been executed and on December 31, 1923, the parties were married. They apparently lived happily together until Mr. Berg's death October 31, 1934, he being then 71 years of age. During the last few years of Mr. Berg's life he was suffering with a heart ailment, and his death was caused thereby. He had been attending to his usual duties every day until and including the day of his death. He died from this ailment while driving his own car. Mr. Berg was about 20 years older than his wife, and his children were much older than the children of the widow. Her youngest daughter was only 16 years of age at the time of trial in 1936, and she had remained at home with her mother and stepfather.

182

The controversy here involves an effort on the part of Mr. Berg's children and the administrator to cancel and annul the antenuptial agreement, including also the mortgage for $3,000 heretofore mentioned. Their theory is that Mr. Berg had been imposed upon because he was so much older than his wife; that he was mentally much the weaker of the two; that he had been unduly influenced by his wife so that certain certificates of deposit in the bank had been made payable by him to both as joint owners with right of survivorship; further, that the wife had persuaded him to convey the homestead to a third person and through such third person to the stepdaughter and herself (reserving, however, a life estate to both husband and wife), hence that these acts amounted to a breach of the antenuptial contract and that it should be set aside; that the certificates of deposit and a certain certificate of corporate stock likewise issued to both of them with right of survivorship should be held to be the property of the estate of Mr. Berg and not the property of the widow as the surviving joint tenant.

The first suit was brought by Mr. Berg's children and the administrator of his estate as plaintiffs, defendant being the widow, Alfreda Berg. The relief therein sought was to cancel and make for naught the $3,000 mortgage. The second suit was brought by the widow as plaintiff against the bank and administrator as defendants to recover possession of certain certificates of deposit and a certificate of stock for five shares in Northern States Power Company.

The court was of opinion and so found that after having made the antenuptial contract "said Alfreda Berg, contrary to and in violation of the said agreement, induced said Ole A. Berg to convey to her and to her daughter, Edith M. Swenson," the homestead. And the same finding was made respecting the certificates of deposit and the stock certificate, the court saying "that such transfers [referring to the transfer of the homestead and the certificates] were all the result of constraint and a substitution of the will of said Elfrida Berg for that of Ole A. Berg, and destroying the free agency of said Ole A. Berg, at the time the various transfers were made." It therefore concluded that "as a result of said breach of contract the mortgage * * * is a nullity and is hereby so declared to be null and

void and is hereby cancelled to be of no effect or force as a mortgage or debt in any way." As to the involved certificates, the court in its conclusions said that Mrs. Berg "obtained an undue influence" over her husband "and thereby secured the signature and transfer" of the same; that these "transfers were in fact the acts of said Elfrida Berg and not the voluntary acts" of her husband. It accordingly "directed" the bank "to deliver to the administrator * * * said certificates and property now in its possession or under its control."

■ First to be considered and determined is the widow's claim that there is total failure of proof of any undue influence on her part to bring about the transactions here involved. Likewise, she contends that there is paucity of proof respecting Berg's senility or mental infirmity of any sort. In this connection she points out that in making the transfer of the homestead the parties went to the same attorney who had prepared the antenuptial agreement and that the transfer of title was made through his office girl. In both instruments it was specifically provided that "this transfer shall in no way operate as a satisfaction" of the rights created by the antenuptial contract and that the $3,000 mortgage "is still to be considered a valid and subsisting lien under and by virtue of the contract heretofore mentioned." This language bears upon its face the distinctive factors going to show the intervention of a capable lawyer who thereby sought to *protect and preserve her rights under the contract*. There is not even a suggestion in the record that she had in any way brought about this deal. It does appear, however, that Mr. Berg was fond of the stepdaughter and thought well of her. This transaction did not take place until March 16, 1934, a period of more than ten years after the marriage. If anything is proved thereby it is that the marriage relation was a happy one and that Mr. Berg wanted to do something more than he bound himself to do in the antenuptial contract.

We have carefully examined the entire record. It is short. The widow was called for cross-examination under the statute. The examination was conducted by experienced counsel. It was, properly, searching in its ramifications. Her testimony is clear, explicit,

and wholly free from the indicia of evasion or concealment generally found if there be improper conduct or anything approaching undue influence. Wholly lacking is the usual answer under such circumstances of "I don't remember" or "don't know." There is absolutely nothing in her testimony justifying even a suspicion that she had in any way attempted anything improper or at all questionable. The testimony of the banker with whom they dealt indicates clearly that the certificates of deposit were subject to the will of Mr. Berg insofar as his certificates were concerned. Until 1928 husband and wife had maintained separate safety deposit boxes. After that the husband surrendered his box, and all papers thereafter were kept in her box. At the trial a great number of these certificates were introduced in evidence. These extend back to and include the year 1923. As we have already noted, the marriage took place the last day of that year. Obviously all certificates then belonging to Mr. Berg were written in his name as the sole depositor and the only one having an interest in them. The same condition prevailed throughout 1924. But from 1925 and on it is obvious that these certificates were changed from time to time so that over a period of many years prior to the death of Mr. Berg the certificates had been renewed and reissued in the name of and payable to the husband and wife as joint tenants or to the survivor. The certificates when cancelled bear upon the reverse side thereof in most circumstances the signature of "Ole A. Berg." In other instances his indorsement would be "Mr. and Mrs. Ole A. Berg," or "Ole A. Berg and Elfrida Berg." Nowhere is there any intimation that the wife in any way persuaded or urged him so to do. In many instances Mr. Berg was alone when these matters were attended to. At other times both would be there together. Both parties had free access to the box and made frequent use of it.

Mr. Berg's children apparently shunned the father's home after the marriage. Yet not one of them has anything to say indicating that the widow was not a good wife and helpmate to their father or that she ever had overreached or overstepped her rightful place in his home. It is not an unusual thing to find that grown-up children resent the remarriage of the parent whose spouse has de-

parted this life. Perhaps that is only natural. We are not intimating that these children entertained any hatred toward the new wife or loss of love and affection toward their father. What has been said is what appears from the record itself. They appear to have lost that intimacy and filial devotion formerly existing when their natural mother was living.

In the widow's behalf, two of Mr. Berg's brothers testified to his mental capacity; that it was about the same the last years of his life as theretofore; that he was a man of amiable disposition, one who would not be likely to get into conflict with anyone, preferring to go along rather than resist. The doctor who attended him after his heart ailment developed testified that in his opinion Mr. Berg was mentally competent, that he was about the same after the ailment struck him as before, although there was a slowing up respecting physical efforts. The butcher and storekeeper with whom Mr. Berg transacted business and who saw him every day over a period of years noticed nothing about his appearance or his demeanor indicating mental or other deterioration. Everybody testifying in the case speaks highly of Mr. Berg. He was a good citizen and neighbor, a faithful churchman, and to it he had lent his aid and counsel as a member of its board of trustees.

One of the principal items of alleged wrongdoing and concerning which there was much said related to the transfer of the homestead. We think the fact that both husband and wife went to the same law office to which they had gone when their antenuptial agreement was drawn is convincing proof that there was nothing hidden or to be hidden about it. Everything was open and aboveboard. And, as a matter of fact, the homestead transfer is not involved in either case. The title thereto remains as it was before these suits were started. Its only relevancy, if such it may be, is whether this was an act on the widow's part indicating that she had some undue or other improper control over her husband's volition. Yet this is one of the acts that forced the court to "the conclusion that there was undue influence."

The certificates of deposit, four in number, range from $65 to $471.25. Their total is only $780. Upon the participating trust

certificate the unpaid balance is only $342.81. Its value is not determined or even estimated. This asset represents the interest of the depositors in slow or worthless assets set aside when the bank reopened after the "bank holiday." The certificate in Northern States Power Company is for five shares of six per cent preferred stock. It was originally issued in May, 1929, and was payable to both husband and wife or their survivor. So it is apparent that the total of all these items is no more than about $1,200. As we have seen, the ownership of the original certificates dates back many years prior to Berg's death. There is nothing about any of them or the means employed to have them issued to husband and wife indicating any undue or other improper influence.

Here, as in all cases of this type, fraud and undue influence must be proved. Neither is presumed. What this court said in McEleney v. Donovan, 119 Minn. 294, 301, 138 N. W. 306, 308, seems appropriate here:

"We think that, before presumptions of undue influence may be drawn from the fact that a donee is the child of the donor, it must appear that such donee stood to the donor in a relation other than the ordinary intimate, and even affectionate, relation existing between parent and child. It must be shown that the donee occupied a position to dominate the donor, or exert an influence over him, by virtue of being intrusted with the donor's business affairs."

So in Thill v. Freiermuth, 132 Minn. 242, 245, 156 N. W. 260, 261, it is said:

"It is not enough that the one benefited had an opportunity to exert undue influence and the motive for exercising it. [Citing cases.] There must be undue influence exercised in fact and it must be effective."

In Wellendorf v. Wellendorf, 120 Minn. 435, 139 N. W. 812, 43 L.R.A.(N.S.) 1144, the situation was somewhat similar to the one here presented. There, as here, the parties had entered into an antenuptial contract. The wife caused to be prepared an assignment of a $900 mortgage owned and held by her husband, having procured

the assistance of a banker with whom she was well acquainted to prepare the form. She took the instrument back to the house where her husband signed it. He was then 81 years of age. She then took the instrument back to the banker who had prepared it for her and who thereupon attached his notarial acknowledgment in due form and signed as a witness. A clerk in the bank also signed as a witness. Neither was present nor saw Mr. Wellendorf execute the instrument. As a matter of fact it was not "acknowledged" at all. Instead of recording the instrument she put it away in a box in which family papers were kept, and there it remained until her husband's death, some three months later. Shortly thereafter she caused it to be recorded. Upon this state of the record the court dismissed the case because (120 Minn. 437):

"There was no evidence of undue influence, none of mental incapacity on the part of Wellendorf, nor that defendant procured her husband to assign the mortgage by any acts of misrepresentation or fraud. For aught that appears, the assignment was the voluntary act of Wellendorf, though it does not appear that any consideration therefor was paid by defendant [the wife]. In this situation of the pleadings and evidence it is clear that a cause of action was not established, and the trial court rightly dismissed the action."

To the same effect is the holding of the court in In re Will of Storer, 28 Minn. 9, 8 N. W. 827. The first two syllabus paragraphs, sustained by the opinion, read as follows:

"Upon an issue as to undue influence in procuring the execution of a will on the part of those who appear to be preferred in it, proof that the will is unequal in its distribution of the property, even though the testator was of impaired mind and memory, is inadmissible if there be no actual evidence of undue influence.

"On such an issue, evidence that the wife of testator, who is one of those preferred by the will, had great control over him in the ordinary affairs of life, is inadmissible without evidence that her influence was exerted to procure the execution of the will."

There are numerous other cases of similar import, but those to which we have referred are, we think, adequate authority for hold-

ing that undue influence is entirely out of this case. Proof of mental incapacity also is wholly lacking.

■ The court seems to have been of impression that the antenuptial agreement could not be changed by voluntary act of the parties thereto because the children of Mr. Berg had a present interest in the property by virtue of the contract; that, inasmuch as they had been informed of the contemplated agreement and had consented (or at least had made no objection) thereto, therein and thereby they had some vested interest or right requiring their consent before any change could be made. The court laid much stress upon the recital or preamble of the agreement wherein the parties in contemplation of marriage "and for the purpose of fixing the property rights of the heirs and children by the former marriages of both parties hereto have agreed to the following as the rights and interest of each in each other's property." Obviously the children were not "heirs" at that time. No one is heir of the living, and neither party could foresee or foretell who such heirs might be. There is no provision in the agreement whereby anything is given to the children of either party, nor even a suggestion of what they as children should get upon the death of either of the contracting parties. Nor is there any limitation, expressed or implied, upon either party's right to have, to use, to give away, or encumber their then or later acquired property. The recital is no part of the contractual obligations assumed by the terms thereof. The children were not parties to the agreement. Under its terms there is nothing they could enforce. We think the agreement clearly left freedom to use their own separate estates as they saw fit.

In this view we think the recital or preamble itself furnishes sufficient proof. Therein the parties say that they *"have agreed to the following as the rights and interest of each in each other's property."* (Italics supplied.) The contract then proceeds with the contractual obligations assumed. Under these circumstances, the language of the court in Martin v. Rothwell, 81 W. Va. 681, 683, 684, 95 S. E. 189, 190, is helpful:

"It seems to be quite clear that paragraphs in a contract containing recitals of the purposes and intentions of the parties thereto are not strictly speaking parts of the contract, unless adopted as such by reference thereto. The obligation of the parties to each other are not fixed by the terms of these recitals, and the only purpose thereof is to define or limit the obligations which the parties have taken upon themselves where the extent thereof is uncertain, or to aid in interpreting any ambiguous language used in expressing such obligation. Such preambles or recitals in a contract are analogous to the preamble in a statute. It is no part of the statute, but frequently it is looked to in determining the proper construction of the act. It ordinarily declares the mischief which it is the intention of the legislature to correct by the passage of the act, and thus offers valuable aid in construing a statute ambiguous on its face. And so in contracts where a preamble of this character is added declaratory of the purposes and intentions of the parties, it will be looked to in construing the contract, and to supply any omissions therefrom which are capable of being supplied by reference to such recitals, but in no sense will it be the basis of a legal and binding obligation of the parties." To the same effect is Wilson v. Towers [C. C. A.], 55 F. (2d) 199.

■  The next question presented is whether the antenuptial agreement precludes the widow from claiming the involved property. On that phase the authorities seem practically unanimous in holding, as stated by the annotator in Estate of Crane, 6 Cal. (2d) 218, 57 P. (2d) 476, 104 A. L. R. 1101 (annotation at 1104):

"The courts are agreed that the right of one spouse to take under the will of the other is not affected by an antenuptial or postnuptial agreement or property settlement between them, except where it is found that such agreement or settlement was intended to be in satisfaction or ademption of any legacies or bequests to the surviving spouse provided for in the will of the other."

In the case of Will of Shirley, 207 Wis. 549, 553, 554, 242 N. W. 207, 209, 86 A. L. R. 1, in a situation where in principle the question presented is substantially the same as here, the court said:

"By the contract the widow agrees that the sum of $1,000 is to be taken in lieu of dower and homestead rights, and that she will renounce all claim against the estate of her husband, and all rights as heir or distributee, and that the agreement is to be considered a legal and equitable bar to all claims which either party surviving the other may make to any part of the property of the other except as agreed upon in the contract. The language plainly indicates an intent merely to free the husband and his estate from the legal rights which would otherwise belong to the widow as incidents of her marital relation. There is no language in the contract that will support a conclusion that the intention of the parties went any further than this. This being true, the contention that the contract was one for the benefit of the children of the testator must also fail. It was intended merely to eliminate the wife's legal claims to her husband's property, and even if it be assumed to have been for the children's benefit to this extent, which is doubtful, it can certainly have no broader scope or effect than this."

And in Wellendorf v. Wellendorf, 120 Minn. 435, 438, 139 N. W. 812, 813, 43 L.R.A. (N.S.) 1144, to which we have heretofore made reference on another phase than that here involved, the court said:

"The antenuptial contract has no pertinent bearing upon the questions involved in the action. The purpose of that contract was to reserve to each party their property and property rights, precisely as though no marriage took place between them, and each thereby reserved the right to sell and dispose of his or her separate property free from any claims on the part of the other. Clearly Wellendorf had the right to sell or give the mortgage to his wife, and he was not prevented from so doing by that contract."

See also Hosford v. Rowe, 41 Minn. 245, 248, 42 N. W. 1018, 1019, also a case involving an antenuptial contract. The court, in discussing the capacity of the husband to give his wife more than the antenuptial agreement required of him, said:

"He could still, of his own volition, bestow upon his wife while living, or by will upon his widow, a greater share of his estate than

that specified in the agreement, and a will once made might be revoked or altered at his own election."

To hold, upon the facts here appearing, that a wife may not accept the bounties of a thoughtful and kindly disposed husband without thereby violating her antenuptial contract seems absurd.

From what has been said it necessarily follows that each order here for review must be and it is reversed with directions to the court below to amend its findings of fact and conclusions of law so as to conform with the views herein expressed.

So ordered.

