## DAVID H. KOCH v. HAN-SHIRE INVESTMENTS, INC.

140 N. W. (2d) 55.

February 4, 1966—No. 39,750.

___

156

*William C. Hunt,* for appellant.

*Reavill, Neimeyer, Johnson & Killen* and *John J. Killen, Jr.,* for respondent.

MURPHY, JUSTICE.

This is an appeal from an order of the district court denying plaintiff's motion for amended findings or in the alternative for a new trial. Plaintiff sought the return of certain stock pledged with the defendant company as security for part of the purchase price of a bottling business. The trial court held that there was a breach of the pledge agreement on the part of plaintiff and denied his claim. The issue presented is whether a creditor-pledgee retains any rights against property pledged by a third-party pledgor when the creditor-pledgee has voluntarily and without expressly retaining any rights elected to terminate the written agreements creating the primary obligation and has retaken possession of the property covered by the agreement.

Because of the way in which the undertakings were expressed, and the manner in which the purchase agreement was created, it is difficult to briefly summarize the specific agreements of the parties. The record contains various writings and some oral testimony with reference to negotiations which led up to the original and supplemental agreements. While this action was brought by David H. Koch as an individual, the materials with which we must deal consist of written undertakings relating to a sale transaction in which the Seven-Up Bottling Company of Duluth, Inc., a corporation, is the purchaser and the Han-Shire Investments, Inc., a corporation, is the seller. In the discussion to follow, the vendee will be referred to as "Duluth Seven-Up" and the vendor will be referred to as "Han-Shire." Plaintiff was the organizer and principal stockholder of the vendee corporation.

From the record it appears that in the fall of 1958 Koch entered into negotiations with Han-Shire for the purchase of a soft drink bottling business having its headquarters in Duluth and operating in the surrounding territory. All of the preliminary negotiations for the purchase of the business were handled by Koch. The purchase was to be made by Duluth Seven-Up. The proposed agreement comprehended the purchase of the assets of the Han-Shire company and its bottling and distribution business for a purchase price of $635,688.04, of which $100,000 was to be paid and a note and chattel mortgage given for the balance. The sale and mortgage agreements were entered into between the two corporations on May 22, 1959. A supplemental agreement was entered into 2 years later. The buyer defaulted in its payments, and on December 14, 1962, Han-Shire rescinded the contract, reentered, and took possession of the property. At that time $28,000 remained unpaid on the $100,000 downpayment. Certain stock belonging to plaintiff was pledged with Han-Shire as security for the unpaid portion of the downpayment. It is the contention of plaintiff that when the seller retook possession of the property referred to in the agreements, the contract was terminated, further liability on the part of Duluth Seven-Up ceased to exist, and there was nothing left to support the right of the seller to possession of the pledged stock. The trial court found to the contrary, being of the view that the transaction involved two separate agreements: (1) An undertaking on the part of Koch individually to pay the downpayment secured by the pledge; and (2) the chattel mortgage and sale agreement relating to the balance of the purchase price. The trial court concluded that the termination of the latter contract did not impair the obligation of the former.

A consideration of the issues thus presented requires an examination of the agreements and undertakings as expressed in various writings. It is clear from the record that the agreed purchase price was $635,688.04 with a proposed downpayment of $100,000. This is apparent from the note and chattel mortgage, which is in the sum of $535,688.04 and on its face apparently assumes receipt of the $100,000 downpayment. The chattel mortgage covers the machinery and equipment contained in the plants and offices of the seller as well as 28 trucks and property rights in various franchises. Contemporaneously with the execution of the note

and chattel mortgage, the corporations entered into an "AGREEMENT OF SALE." This agreement between Han-Shire, referred to as "Vendor," and Duluth Seven-Up, referred to as "Vendee," contains a comprehensive recital of the nature and scope of the undertakings of the parties involved. The agreement included the assignment of leases and the transfer of franchises giving the vendee the right to manufacture and distribute soft drinks identified as "Seven-Up," "Orange Crush," and "Seven-Up Pre-Mix" products. The agreement describes the geographical areas in which the purchaser was permitted to engage in the sale of these products as well as a description of equipment and advertising material, and provides that the vendee assume outstanding obligations of the vendor on certain existing mortgages and leasing agreements in connection with the business. This agreement is not consistent with the note and chattel mortgage in that it recites that only $50,000 of the downpayment has been made and that the balance of the downpayment is to be subsequently paid by Duluth Seven-Up. It is at this point that the parties to this suit differ. Is the balance of the downpayment the obligation of the vendee corporation as the sales agreement states, or is it the primary obligation of the individual plaintiff created by a pledge agreement?

Although the dispute with which we are here concerned is between Koch as an individual and the Han-Shire corporation, the outcome must turn upon an interpretation of the agreement between the vendor and vendee corporations. Defendant has taken the position that whatever rights it may have to foreclose the lien of the purchased stock are derived from the sale agreement of May 22, 1959. This is the line along which the issues were framed and contested in the court below. The answer of defendant recites "that said shares of stock so deposited with defendant by plaintiff were pledged by plaintiff, pursuant to the provisions of said paragraph (2)(b) [of the sale agreement of May 22, 1959] for the purpose of securing an additional $50,000 cash payment by the vendee under said contract, and were so pledged by plaintiff, as principal owner of said vendee, as an inducement offered by said plaintiff to defendant to enter into said Agreement of Sale." We accordingly conclude that the intent of the parties with reference to the pledge must be gathered from the undertakings expressed in paragraph (2)(b) of the sale agreement and

further recitals contained in a supplementary contract which will be referred to hereafter. Paragraph (2)(b), which expresses the extent to which plaintiff is individually involved, provides as follows:

"(2) Vendee [Duluth Seven-Up] hereby agrees to make payment of said total purchase price for the personal property described in paragraph (1) above, in the sum of $635,688.04, upon the following terms and provisions, to-wit:

"(a) Fifty Thousand Dollars ($50,000.00) in cash at the time of the execution of this agreement, the receipt whereof is hereby acknowledged by the Vendor.

"(b) An additional Fifty Thousand Dollars ($50,000.00) in cash to be subsequently paid by said Vendee to said Vendor. To secure said additional cash payment David M. Koch of St. Paul, Minnesota, as principal owner of the capital stock of the Vendee, has pledged with the Vendor all of the capital stock owned by said David M. Koch in the Seven-Up Bottling Company of Rochester, Minnesota, a Minnesota corporation, the receipt whereof is hereby acknowledged by the Vendor. It is understood and agreed by the Vendor and Vendee and by said David M. Koch that the pledge of said stock is an inducement offered by said David M. Koch to the Vendor to enter into this agreement of sale, and said David M. Koch has represented to the Vendor that he is the owner of at least 40% of the issued and outstanding capital stock of Seven-Up Bottling Company of Rochester, Minnesota. Said David M. Koch has further agreed with the Vendor that he will forthwith furnish the Vendor with a certified statement of the proper officers of said Seven-Up Bottling Company of Rochester, Minnesota, evidencing his ownership of said stock and said David M. Koch further agrees with the Vendor that by the execution of this agreement on behalf of the Vendee he further individually guarantees the pledge of said stock and the continuance of his ownership of said stock until the payment of said additional $50,000.00 in cash provided for by this sub-paragraph (b), and Vendor agrees with said David M. Koch that it will hold said shares of stock in trust until said additional cash payment of $50,000.00 is made to it, at which time it shall return said stock to said David M. Koch. Said additional cash payment set

forth in this sub-paragraph (b) shall bear interest at the rate of four (4) per cent per annum from and after April 1, 1959."

It is to be noted that the agreement provides that the balance is "to be subsequently paid by said Vendee to said Vendor." It provides that Koch has pledged certain stock with Han-Shire and has agreed that it may be held until the balance of the downpayment is paid. It does not recite that the balance is a personal obligation of Koch, nor is there any provision made as to when the balance is to be paid. It may be fairly said that this agreement comprehends that the vendee corporation will pay all of the purchase price including the unpaid balance of the downpayment and, as to the latter aspect of the transaction, Koch individually has pledged his stock as security.

The agreement of sale contains further provisions which are important as they bear upon the issues in this case. The agreement would indicate an intent of the parties to modify or transform the chattel mortgage so as to give the transaction features of a conditional sales contract. Paragraph (8) of the agreement provides that in the event of a breach of obligation on the part of the purchaser, Han-Shire would have the right to reenter and repossess the property. That provision recited:

"* * * [T]he Vendor shall have the right to declare this agreement forfeited and void, and it may thereupon re-enter and take full and absolute possession of the premises * * * as well as all of the machinery, equipment and personal property of every kind and nature whatsoever covered by the terms and provisions of this agreement."

This paragraph further provided:

"* * * If said Vendee shall fail to make the payments herein provided on the dates herein specified or should said Vendee [Seven-Up] fail to remedy or rectify any other breach of this agreement within twenty (20) days after the receipt of written notice from the Vendor specifying such breach as hereinbefore provided for, then and in either of such events the Vendor shall have the right to declare this agreement forfeited and void as above provided."

In the event of a breach and the declaration of forfeiture, the agreement provided:

"* * * Any payments made by Vendee to Vendor under the terms and provisions of this agreement prior to the Vendor's exercise of the option hereby granted, shall constitute liquidated damages for the breach of this agreement."

We must next consider a supplementary agreement entered into between the parties on May 12, 1961. This agreement is important in that it expresses the understanding or interpretation given to the agreement by Han-Shire. On May 12, 1961, no part of the $50,000 balance of the downpayment had been paid. By this agreement Seven-Up was authorized to sell part of the encumbered assets for the sum of $24,000. Of that amount $12,000, together with an additional $10,000 contributed by Seven-Up, making a total of $22,000, was paid in reduction of the unpaid downpayment. The remaining $12,000 of the proceeds of sale were applied to the balance of the purchase price. The supplemental agreement recites that the balance of the downpayment, reduced to $28,000, was to be paid by the Seven-Up corporation under a specific formula based upon sales volume, and in the event of failure of that method, Seven-Up was to pay the sum of $5,000 per year until fully paid. Here, it is to be noted that the obligation to pay the balance of the downpayment rests upon the Duluth Seven-Up corporation and not upon Koch individually. This circumstance is obviously not consistent with the defendant's theory that the pledge of stock is supported by a separate promise given by Koch. It should also be noted that under this agreement Seven-Up relinquished to Han-Shire, until such time as the balance of the downpayment was paid, a part of the franchised territory acquired under the sales agreement. With reference to the pledged stock, the supplemental agreement recited:

"* * * [W]hen the sums so paid pursuant to this paragraph equal the portion of the purchase price specified in paragraph (2)(b) of said Agreement of sale * * *, Han-Shire agrees to re-deliver to said David H. Koch the shares of stock of the Seven-Up Bottling Company of Rochester now held by Han-Shire as security pursuant to said paragraph (2)(b).

"* * * and provided further [that] Han-Shire's obligation to re-deliver

to said David H. Koch the shares of stock described in paragraph 3 above shall take effect only when that portion of the purchase price described in paragraph (2)(b) of said Agreement of Sale plus accrued interest thereon has been fully paid and satisfied."

Although there was some evidence to the effect that Koch represented to the officers of the Han-Shire corporation at or about the time of the original sale contract that the balance of the downpayment would be "subsequently paid" out of money he expected to receive from an inheritance, there is no claim that in the negotiations involved in the supplemental agreement any representations or inducements were made by him, and it is conceded that he executed the agreement in his capacity as a corporate officer the same as he had executed the original agreement. It may also be observed that some of the amount paid in reduction of the obligation of Duluth Seven-Up came from a liquidation of part of the encumbered business. Moreover, the supplemental agreement clearly comprehends that the balance of the entire purchase price, including the downpayment, is to be paid by the corporation from the proceeds of its business.

It appears that in the years 1961 and 1962 the operations of the Seven-Up company were not profitable and it became involved in financial difficulties. It failed to meet its payments to Han-Shire under the provisions of the agreements. Accordingly, on December 14, 1962, Han-Shire, exercising rights reserved by the agreement of May 22, 1959, addressed to Seven-Up a letter which declared the sale agreement "forfeited and void" and announced that it would exercise its right under the agreements to reenter and take possession of the "property of every kind and nature covered by the terms and provisions of said agreement, as supplemented." No reference was contained in this notice to the pledged stock held by Han-Shire. It was comprehended and agreed that under the provisions of the contract already quoted, payments made pursuant to its terms constituted liquidated damages for the breach.

On December 19, 1962, after Han-Shire had taken possession of the property covered by the chattel mortgage and agreements, Koch served on defendant a notice demanding return of the stock certificates which he had placed in the possession of defendant. Defendant refused to return

the certificates. By this action, plaintiff sought a declaratory judgment that defendant had no right or claim against the pledged stock and that plaintiff was the owner, and an order directing defendant to return the pledged stock to plaintiff. After plaintiff deposited the sum of $28,000 with the clerk of court, a stipulation was entered into between the parties by which the stock certificates were returned to plaintiff.

As we have already stated, the trial court concluded that there was a separate undertaking by Koch individually, secured by the pledge, to pay the balance of the downpayment. It was the trial court's view that the downpayment was a condition precedent to the sale; that this condition would have been met had it not been for the failure or delay of Koch to receive an expected inheritance, and that the pledge of stock was taken in lieu of the contemplated downpayment. To reach this conclusion, the trial court relied on parol evidence from which he found an undertaking on the part of Koch, contrary to that expressed in the written agreements. Because the evidence upon which the trial court relied is so vague and equivocal, and because of language used in the written undertakings which control the issue before us, we reach a different result.

It seems to us that if Koch had individually assumed the obligation to pay the full downpayment, the parties would have said so. The whole record established that Koch was the negotiator and that Duluth Seven-Up was the purchaser. It was the corporation which was to assume liability for the obligations involved. If the understanding were otherwise, Han-Shire's lawyers, who prepared the written agreements, could have clearly and definitely expressed the intention of the parties.

The record indicates that when it became apparent that the cash balance of the downpayment could not be paid, a new arrangement had to be made. This arrangement, which expresses Koch's status in the transaction, was set forth in the sale agreement. This agreement contradicts the claim that there was a personal liability. It indicates at most that Koch was a guarantor as to $50,000 of the purchase price to the extent of the value of the pledged stock. When Han-Shire rescinded the contract, the provisions of paragraph (2)(b) relating to the pledge were likewise rescinded; the principal debt was extinguished; and Koch became entitled to the return of his pledged stock.

■ This conclusion follows from application of the following principles of law. The pledge, which is one of the simplest forms of security devices, creates an interest "in a chattel or in an intangible represented by an indispensable instrument, the interest being created by a bailment for the purpose of securing the payment of a debt or the performance of some other duty." Restatement, Security, § 1.

■ It is a familiar doctrine that where instruments relating to the same transaction are executed at the same time and for the same purpose, they will be read together and each will be construed with relation to the other unless the parties stipulate otherwise. Anchor Cas. Co. v. Bird Island Produce, Inc. 249 Minn. 137, 82 N. W. (2d) 48; Lapp v. Loufek (D. Minn.) 113 F. Supp. 65; Fleisher Engineering & Const. Co. v. Winston Bros. Co. 230 Minn. 554, 42 N. W. (2d) 396; 4 Dunnell, Dig. (3 ed.) § 1831. These written agreements establish that there was but a single seller, a single buyer, and a single purchase price of $635,688.04. The method of paying the purchase price is fully set forth in the agreements. On this point, the written documents are clear and unequivocal. The extent of what plaintiff agreed to do was carefully limited to a pledge of stock as collateral to the principal obligation of the corporate vendee.

■ The cardinal purpose of construing a contract is to ascertain the intention of the parties from the language used by them and by a construction of the entire agreement or writings of which the contract consists. Employers Lia. Assur. Corp. v. Morse, 261 Minn. 259, 111 N. W. (2d) 620; Country Club Oil Co. v. Lee, 239 Minn. 148, 58 N. W. (2d) 247. Here again, it may be pointed out that Han-Shire contends that its right to the lien on the pledged stock derives from the written undertaking expressed in (2)(b) of the sale agreement. If we take Han-Shire at its word, and examine this agreement with the modifications contained in the supplemental agreement, we are constrained to hold that Koch's liability was secondary and it was the intention of the parties that the stock would be pledged as collateral to secure the payment of a debt so long as that debt remained in existence.

■ Where a contract is open to two interpretations, the one more favorable to the party who did not draft the instrument should be adopted in the absence of a clear showing that a contrary meaning was intended at

the time of the execution. Naftalin v. John Wood Co. 263 Minn. 135, 116 N. W. (2d) 91; Indianhead Truck Line, Inc. v. Hvidsten Transport, Inc. 268 Minn. 176, 128 N. W. (2d) 334. While it is true that Koch was not a party to the sale agreement and the supplementary agreement, this principle should have force since the written agreements upon which it relies were prepared by the defendant corporation.

■ A rule of construction which is particularly important in this case is that the practical construction of the parties themselves is persuasive evidence of what the parties intended by it. Effengham v. Pesch, 182 Minn. 586, 235 N. W. 278; Leslie v. Minneapolis Teachers Retirement Fund Assn. 218 Minn. 369, 16 N. W. (2d) 313; Farmers State Bank v. Sig Ellingson & Co. 218 Minn. 411, 16 N. W. (2d) 319; Cut Price Super Markets v. Kingpin Foods, Inc. 256 Minn. 339, 98 N. W. (2d) 257; Kastner v. Dalton Development, Inc. 265 Minn. 511, 122 N. W. (2d) 183; 4 Williston, Contracts (3 ed.) § 623. It is unnecessary to emphasize again that the agreements imposed liability for the entire purchase price upon the corporation itself and not upon the individual plaintiff. It was clearly intended that the purchase price should be liquidated not only out of the earnings of the vendee corporation, but as well from a liquidation of part of the encumbered assets.

■ As we have previously indicated, the trial court utilized parol evidence of statements made during negotiations prior to and contemporaneous with the execution of the written agreements to find an oral undertaking on the part of plaintiff. Plaintiff relies on the rule that parol evidence which can be admitted to explain a contract must be such as tends to show the correct interpretation of the language used, and its only purpose is to enable the court to understand what the language really means. Such evidence should be directed to aiding the court in declaring the meaning of what is written in the instrument and not to create a new contract imposing another and different obligation. Anchor Cas. Co. v. Bird Island Produce, Inc. 249 Minn. 137, 82 N. W. (2d) 48. Han-Shire contends that there is nothing in the record indicative in any way that parol evidence was used to contradict any of the written terms of the agreement or the supplemental agreement and relies on Weyerhaeuser Co. v. Hvidsten, 268

Minn. 448, 129 N. W. (2d) 772, and Steller v. Thomas, 232 Minn. 275, 45 N. W. (2d) 537.

The force of the parol evidence rule as applied to the situation here, where one of the litigants is a party to the written contract and the other is not, is not argued or discussed. We assume that the parties concede that, as to this issue, Koch may be considered as a party to the contract and is entitled to the benefits of the rule subject to its limitations and exceptions. It is not necessary for us to belabor this point. We have examined the record and are satisfied that the testimony as it bears upon the nature of Koch's obligation is so equivocal as to fall short of constituting evidence which would support a finding of a separate and independent individual undertaking.

The record compels the conclusion that it was understood that the corporation was to assume liability for the full purchase price. Whatever importance may be attached to the oral testimony, we do not think that it provides facts and inferences sufficient to warrant a finding of what was said and done in preliminary negotiations contrary to that which is expressed in the writing upon which Han-Shire relies.

■ As a general rule, the effect of rescission is to extinguish the contract so effectively that in contemplation of law it has never had existence. In Merickel v. Erickson Stores Corp. 255 Minn. 12, 16, 95 N. W. (2d) 303, 306, we said:

"* * * Rescission as a general rule must be exercised in toto and is applied to the contract in its entirety with the result that what has been done is wholly undone and no contract provisions remain in force to bind either of the parties."

When Han-Shire terminated the contract and reentered and took possession as it had the right to do, the effect was to discharge the principal debt, and further liability under the contract was likewise discharged; the obligation ceased to have existence for any purpose, and the pledgor became entitled to a return of the pledged property. 41 Am. Jur., Pledge and Collateral Security, § 73; 72 C. J. S., Pledges, § 29; 17 Am. Jur. (2d) Contracts, § 516; Northern Drug Co. v. Abbett, 205 Minn. 65, 284 N. W. 881, 121 A. L. R. 1349.

In O'Donnell Shoe Co. v. Benson Co-op. Merc. Co. 175 Minn. 382, 385, 221 N. W. 426, 427, we said:

"The reservation of rights against one secondarily liable must be clearly expressed. A debt which has been extinguished by voluntary act of debtor and creditor, as by accord and satisfaction or composition, will not even support a new promise."

It should be further emphasized that the notice of termination of the agreement sent to the Seven-Up corporation by Han-Shire omits any reference to the lien of the pledge. Since Seven-Up's principal obligation had been extinguished, it should follow that a mere secondary obligation must likewise be extinguished.

There is considerable discussion in the briefs with reference to the characteristics of the agreements and whether Han-Shire's rights should be measured by rules of law as they apply to chattel mortgages on the one hand or to conditional sales on the other. It is apparent from our discussion that this transaction bristles with numerous legal points which we are not obliged to consider. We must take the issues as they are made by the record. It is only necessary to say, with reference to the nature of the transaction, that it does not seem of much importance here how the contract is labeled. It is clear from the terms of the sale agreement which was executed contemporaneously with the chattel mortgage that Han-Shire had the right upon breach to declare the agreement "forfeited and void" and to reenter and "take full and absolute possession" of the property sold and to retain any payments made "prior to the Vendor's exercise of the option" as "liquidated damages for the breach of this agreement." This provision eliminated the necessity of foreclosure and public sale in the statutory manner (Minn. St. 511.10 and 511.11) and for an action to recover any deficiency. No claim is made that Han-Shire was without right, when forfeiture occurred, to terminate the agreement by declaring it "forfeited and void." It is obvious that Han-Shire understood that on breach it could retake possession and satisfy the debt in that manner, thus preserving a continuity in the operation of the business which might well have been impossible had a chattel foreclosure proceeding been required. Han-Shire's conduct was entirely consistent with the exercise of

an option to which the seller is entitled under a conditional sales contract. Yellow Mfg. Acceptance Corp. v. Handler, 249 Minn. 539, 83 N. W. (2d) 103.

It is unnecessary for us to review the record as it bears upon plaintiff's assertion that Han-Shire is bound by its election of remedies and that having terminated the contract and repossessed the property, it is now foreclosed from pursuing a remedy against the pledged stock. We dispose of this case by concluding that when Han-Shire rescinded the contract upon which it relies, the obligations of Duluth Seven-Up terminated; that the complete agreement was extinguished and undone; and with that act Han-Shire's rights to the pledged property ceased.

Reversed with direction for entry of judgment for plaintiff.