STATE of Minnesota by the CROW WING ENVIRONMENT PROTECTION ASSOCIATION, INC., Appellant,

v.

CITY OF BREEZY POINT, Respondent,

Whitebirch, Inc., Respondent,

Minnesota Environmental Quality Council, Defendant.

No. C5–84–1136.

Court of Appeals of Minnesota.

Feb. 26, 1985.

Stephen C. Rathke, Brainerd, for appellant.

Patrick M. Krueger, Brainerd, for City of Breezy Point.

John M. Mason, Minneapolis, John T. Finley, St. Paul, for Whitebirch, Inc.

Christie J. Bennett, St. Paul, for Minnesota Environmental Quality Council.

Heard, considered and decided by FOLEY, P.J., and NIERENGARTEN and LANSING, JJ.

## OPINION

FOLEY, Judge.

This is an appeal from an order denying the motion of Crow Wing Environment Protection Association, Inc. for an injunction to enforce a stipulated settlement.[1] The motion alleged that Whitebirch violated a settlement by abandoning the sale of condominium campsites in favor of a membership-lease concept. We reverse and remand.

## FACTS

Appellant Crow Wing Environment Protection Association, Inc., (CWEPA) is a nonprofit corporation organized to protect and enhance the environment in Crow Wing County. Respondent Whitebirch, Inc., is a business located in Breezy Point and is the owner and developer of the project which is the subject of this action.

In 1974, Whitebirch announced plans to develop 2,300 acres within Breezy Point. The plan included 3,000 "condominium camping lots," 480 homesites, 180 estate lots, 256 condominium apartments, a swimming pool and other facilities.

Whitebirch prepared an Environmental Impact Statement (EIS) for the project pursuant to Minn.Stat. § 116B.01–11 (1974). The statement indicated that they planned

---

1. This is an appealable order under Minn.R.Civ. App.P. 103.03(b) and (g).

to build 3,000 condominium campsites and the occupancy rate was expected to be about 30%. The Environmental Quality Council accepted the EIS.

In 1976, CWEPA sued Whitebirch under the Minnesota Environmental Rights Law, Minn.Stat. § 116B.01–11 (1974), to enjoin this development. The complaint alleged that the Whitebirch project would substantially increase the permanent and temporary populations in Breezy Point and that the increase would cause overcrowding of the area's lakes, public accesses, roads, and other facilities. CWEPA alleged such crowding would cause irreparable harm to its members, would lessen their property value, and would adversely affect the air, water and quietude of the area.

Shortly after the trial began, the parties agreed to a stipulated settlement. The settlement permits Whitebirch to "develop and sell" not more than 750 campsites within the project, 366 to be constructed on the property identified as campground cluster no. 1. The remaining campsites are to be constructed in one contiguous cluster referred to as campground cluster no. 2. The settlement required Whitebirch to execute a declaration of covenants embodying the provisions of the settlement as covenants which run with the land. The declaration of covenants provides in part as follows:

... WHEREAS, Whitebirch desires to develop said land as condominium campsites, homesites, and related facilities ...

1. Whitebirch may develop and sell no more than Seven Hundred Fifty (750) campsites within the boundaries of the property identified as the "Whitebirch Project" in Appendix A, subject to the following terms and conditions:

(a) Not more than Three Hundred Sixty-Six (366) such campsites shall be constructed on the property identified as Campsite Cluster No. One in Appendix A; and

(b) The remaining campsites permitted by this agreement shall be constructed in one contiguous cluster (hereafter "Campsite Cluster No. Two") anywhere within

that portion of Whitebirch identified in Appendix A as "Tract Two";

(c) Construction of the campsites in Campsite Cluster No. Two shall not commence until Whitebirch shall have completed the development and sale of not less than Two Hundred Forty-Four (244) of the campsites located in Campsite Cluster No. One and until the central sewer system of the City of Breezy Point shall have been extended to Campsite Cluster No. Two and connected to the comfort stations or such other sewage disposal facilities as may be installed therein.

No claim of violation of the agreement is asserted as to campsite cluster no. 1. The membership lease concept has been presented only with respect to cluster no. 2.

After the settlement, Whitebirch attempted to develop campsite no. 2 as a membership-lease campground. Rather than purchase a campground in fee, buyers purchase only "membership rights" to use the facilities of the campground, when available, pursuant to a membership-lease contract in Breezy Point Membership Campgrounds, Inc. The plan is similar to a time-sharing arrangement, except use of the campsites is on a first-come, first-served basis. Whitebirch expects to sell ten times as many memberships as it has lots in campground cluster no. 2 by means of the membership-lease concept.

CWEPA sued for an injunction to prevent Whitebirch from selling membership-leases in campsite no. 2. The trial court rejected their claim stating the settlement document is clear and does not restrict Whitebirch from leasing membership interests.

## ISSUES

1. Did the trial court err by holding the agreement concerning campsite no. 2 to be unambiguous?

2. Does an agreement permitting Whitebirch to "develop and sell" campsites require a determination of intent where Whi-

tebirch contemplates a membership-lease concept?

## DISCUSSION

1. The trial court ruled that the settlement agreement was unambiguous. The settlement imposed no restrictions upon the definition of "campsite" or "sale" contained in Paragraph 1 in the operating language. The court implied by its decision that the right to sell includes the membership-lease concept.

■■■ A contract is ambiguous if it is susceptible of more than one interpretation based on its language alone. *Lamb Plumbing & Heating Co. v. Kraus-Anderson*, 296 N.W.2d 859, 862 (Minn.1980). The initial question of whether a contract is ambiguous is a question of law to be decided by the trial court, and therefore this court on appeal is not bound by the trial court's determination. *Lamb Plumbing & Heating Co.* at 862.

■■■ Where the language of a contract is plain and unambiguous, there is no room for construction. *Polk v. Mutual Life Insurance Co.*, 344 N.W.2d 427, 430 (Minn. App.1984), (citing *Starr v. Starr*, 312 Minn. 561, 562–63, 251 N.W.2d 341, 342 (1977).

■■■ The question involves interpretation of a restrictive covenant which was originally created to protect the environment. Here there is an ambiguity in the meaning and application of the stipulation. The words, "may develop and sell no more than 750 campsites" may restrict Whitebirch's ability to lease ten memberships per campsite, for that could allow up to ten times the usage contemplated under the settlement. Therefore, it was error to hold the settlement unambiguous.

2. There is a serious question whether the stipulation includes the membership-lease concept now contemplated by Whitebirch. To properly interpret the settlement requires an understanding of the intent of the parties.

■■■ Since the document is ambiguous, extrinsic evidence is necessary to determine the intent of the parties. *See Midway Center Associates v. Midway Center, Inc.*, 306 Minn. 352, 237 N.W.2d 76 (1975). Therefore, this case should be remanded to determine the intent of the parties. Among other documents, the trial court should review the Environmental Impact Statement and consider its application to the stipulation.

## DECISION

We reverse and remand for determination of the intent of the parties.