STATE of Minnesota by the CROW WING ENVIRONMENT PROTECTION ASSOCIATION, INC., Respondent,

v.

CITY OF BREEZY POINT, et al., Defendants,

Whitebirch, Inc., Appellant.

No. C2–86–420.

Court of Appeals of Minnesota.

Oct. 21, 1986.

Review Denied Dec. 17, 1986.

Stephen C. Rathke, Borden, Steinbauer, Rathke & Krueger, Brainerd, for State of Minnesota by the Crow Wing Environment Protection Association, Inc.

John M. Mason, Dorsey & Whitney, Minneapolis, for Whitebirch, Inc.

Heard, considered and decided by FORSBERG, P.J., and FOLEY and LANSING, JJ.

## OPINION

LANSING, Judge.

This appeal is from an order entered against appellant Whitebirch, Inc., permanently enjoining it from developing its campground as a membership campground. We affirm.

## FACTS

Whitebirch, Inc., owns and develops real estate in and around the city of Breezy Point, Minnesota. In 1974 Whitebirch announced a plan to develop 2,300 acres near the city. The plan included 3,000 condominium camping lots, 480 homesites, 180 estate lots, 256 condominium apartments and associated recreational facilities. The dispute which resulted in this appeal arose from the proposed development of condominium camping lots on 80 acres within the project.

Whitebirch prepared an Environmental Impact Statement (EIS) for the project in compliance with the Minnesota Environment Protection Act (MEPA), Minn.Stat. § 116B.01–11 (1974). The original EIS predicted maximum one-day occupancy rate for the campsite development at 30 percent. Before accepting the EIS as final, the Minnesota Environmental Quality Council required a supplemental EIS to consider occupancy rates higher than 30 percent. Whitebirch appended information on the impact of peak rates of 30, 60, 90 and 100 percent, and the original EIS was finally accepted.

In May 1976 respondent Crow Wing Environment Protection Association (CWEPA) sued Whitebirch under MEPA, seeking to enjoin the entire project. CWEPA alleged that the proposed development would cause population pressures which would adversely affect the environment.

Shortly after the trial began, the parties entered into a stipulated settlement. Paragraph 1 of the stipulation permits Whitebirch to "develop and sell" not more than 750 campsites (25 percent of the 3,000 originally proposed). Campsite development is restricted to specific tracts of land within the project. Of the total number of campsites allowed, a maximum of 366 could be developed on a tract designated as campground cluster no. 1. The remaining campsites were to be confined within a tract called campground cluster no. 2. Paragraph 2 prevents Whitebirch from building any campsites "other than the campsites permitted in paragraph 1" within five miles of Breezy Point. The stipulation also required Whitebirch to execute a declaration of covenants embodying the provisions of the stipulation as covenants which run with the land.

Whitebirch completely developed campground cluster no. 1 and sold all but 20 lots as condominium campsites in fee ownership to individuals. However, in 1983 Whitebirch abandoned the condominium campsite plan and undertook to develop the campsites in cluster no. 2 as a membership campground. Under this new plan, Whitebirch would retain ownership of the lots and sell "membership rights" to use the campground facilities. Purchasers would contract with Breezy Point Membership Campground, Inc. (BPMCI), a corporation formed by Whitebirch to administer the campground scheme, to use the campsites on a first-come, first-served basis, similar to a time-share arrangement. Whitebirch expected to sell ten times as many memberships as it had campground lots.

CWEPA brought a second suit to enjoin Whitebirch from violating the terms of the settlement. CWEPA contends the stipulation prohibits Whitebirch from offering the campsites on a membership basis and requires that the campsites be sold in fee to individual owners.

The trial court denied the injunction, ruling the stipulation unambiguous and holding that its language did not restrict uses other than sale of campsites as condominiums.

On appeal to this court, the order was reversed. *See State by Crow Wing v. City of Breezy Point,* 363 N.W.2d 778 (Minn.Ct. App.1985). We held the trial court erred in finding the stipulated language unambiguous and remanded for the court to consider extrinsic evidence in determining whether the parties intended to exclude the membership lease concept.

On remand the trial court held that the parties intended that Whitebirch could only sell the campsite lots to individual owners. It further held that sale of memberships was contrary to that intent, and Whitebirch

was permanently enjoined from selling membership rights to the campground lots. CWEPA requested and received reimbursement for its attorney's fees under a provision in the settlement agreement.

Whitebirch appeals the permanent injunction, the award of attorney's fees, the denial of its motions to amend the findings of fact or to grant a new trial, and the denial of its motion to remove and disqualify the trial judge.

## ISSUE

Does Whitebirch's plan to sell memberships as part of a leased time-share campground violate the stipulation, which permits Whitebirch to "develop and sell" not more than 750 campsites?

## ANALYSIS

Whitebirch and CWEPA resolved their first lawsuit by a stipulated settlement in March 1977. The series of judgments and orders entered after 1977 all originated in attempts to interpret that stipulation. The language at issue provides:

> Whitebirch may develop and sell not more than Seven Hundred Fifty (750) campsites * * * within the Whitebirch Project.

Whitebirch developed 366 campsites in the first cluster and sold 346 to individual owners. For reasons not disclosed in the record, presumably economic, Whitebirch abandoned individual sales in the second cluster and began a membership campground arrangement. At the beginning of 1985 the campground had 700–750 memberships. This number had increased to 900 by the time of the hearing, and the ultimate membership goal was 4,000. The occupancy rate for the 900 members had not exceeded 16 percent.

On remand, after the first appeal to this court, the trial judge determined that Whitebirch violated the stipulation by developing campsites and selling memberships to the campground rather than developing and selling individual campsites.

■ Whitebirch correctly argues that almost all of the evidence before the trial court was documentary. Documentary evidence is subject to de novo review. *Merriman v. Sandeen*, 267 N.W.2d 714, 717 (Minn.1978); *see Northern States Power Co. v. Williams*, 343 N.W.2d 627, 630 (Minn.1984). However, the reasoning contained in the trial court's order and memorandum based on documentary evidence is instructive.

The court found that membership campgrounds were neither mentioned nor discussed during the 1976–77 settlement negotiations. But the intent of the parties and their lawyers from 1974 had been to develop campsites to be sold by Whitebirch in fee to individual owners who could then use, resell or lease their condominium lots. The court further found that this intent excluded the concept of a membership campground.

■ The court based these findings on the wording of the stipulation together with the declaration of covenants and the description of condominium in the Environmental Impact Statement.[1] We find this reasoning persuasive.

CWEPA settled a good-faith claim in return for the rights and obligations set forth in the stipulation. Whitebirch does not dispute the validity of the stipulation. It is therefore binding upon both parties and should be analyzed under contract law. *Ryan v. Ryan*, 292 Minn. 52, 193 N.W.2d 295 (1971).

■ In considering evidence of the parties' intent, the trial court properly re-

---

1. Whitebirch contends that the EIS should not be used to interpret the stipulation because the parties agreed in the stipulation that only the land for which no specific provision was made would be developed in accordance with the EIS. Since specific provision was made for the development of the campsites, Whitebirch argues that the EIS cannot be used. This argument misconstrues the purpose of looking to the EIS. We seek not to enforce the provisions of the EIS, but to determine from a contemporaneous document the meaning of words used in the stipulation.

lied on the declaration of covenants. The covenants are incorporated by reference into the stipulation and run with the land. As instruments relating to the same transaction and for the same purpose, the stipulation and declaration of covenants are read together. *Koch v. Han-shire Investments, Inc.*, 273 Minn. 155, 165, 140 N.W.2d 55, 62 (1966). Although "condominium" is not mentioned specifically in the stipulated settlement, it is used in the recitals of the declaration of covenants. While the general rule is that recitals are not the basis of a binding agreement, *Berg v. Berg*, 201 Minn. 179, 188, 275 N.W. 836, 842 (1937), they are helpful as an aid in interpreting ambiguous language. *Id.* at 189, 275 N.W. at 842. The recitals describe the land and state that Whitebirch intends to "develop said land as condominium campsites, homesites and related facilities."

■ Interpretation of disputed contractual provisions requires the court to place itself in the position of the parties at the time the agreement was negotiated. *Midway Center Assoc. v. Midway Center, Inc.*, 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975). At the time the parties negotiated this settlement, CWEPA's expressed concern was to minimize the adverse environmental impact of overcrowding the area's lakes, public accesses, roads and other facilities as a result of the Whitebirch project.

Whitebirch agreed to reduce the number of campsites to 750. Even though the number of campsites is limited, the number of users under the membership concept would approach 4,000. The intensity of use would be much greater as a membership campground than if under individual ownership.

In determining the position of Whitebirch at the time of the agreement, we think it is reasonable to look to the EIS to determine the context in which they used "develop and sell" and "condominium." *See Medtronic, Inc. v. Catalyst Research Group*, 664 F.2d 660 (8th Cir.1981). The EIS prepared by Whitebirch describes the entire project. It describes the campgrounds as a "condominium camping community" and as "campsites-for-sale." In particular, the EIS explains the distinction between the condominium campground proposed and a rental campground situation. In addition, the term "condominium" has a common meaning of individual or separate ownership. *See American Heritage Dictionary*, p. 307 (2nd ed. 1976).

We agree with the trial court's conclusion that the parties intended, at the time of the agreement, that Whitebirch was to sell the campsites to individual owners. A membership campground is contrary to this intent. Although the basis for the court's finding of irreparable harm is not extensively stated, we consider references to the effects of a substantial increase in the use and occupancy density to be adequate to support the injunction. The trial court's judgment and permanent writ of injunction properly restricts Whitebirch from converting the campsites to a membership campground.

The dissent interprets the stipulation as if no ambiguity exists. This interpretation ignores the holding of *State by Crow Wing v. City of Breezy Point*, 363 N.W.2d 778 (Minn.Ct.App.1985), in which we held the language to be ambiguous and remanded to the trial court for a determination on the intent of the parties. *Id.* at 781.

Whitebirch also challenges the trial court's award of attorney's fees to CWEPA, because the court failed to state an hourly rate in determining the award.

■ A court's determination of reasonableness of attorney's fees must be based either upon its observation of the services performed or proof of their value. *Ryan v. Bigos Properties by Bigos*, 351 N.W.2d 680 (Minn.Ct.App.1984). CWEPA submitted proof of the hourly basis for only part of the attorney's fees it requested. The trial court granted the full request, basing the validity of the changes on the fact that substantially all the fees had already been paid.

Whitebirch did not dispute these amounts before the trial court. We are satisfied

that the amounts awarded were within the trial court's discretion.

 Whitebirch also appeals the trial court's failure to recuse itself after making a statement which was reported in the Country Echo newspaper. The comment was made after the determination of the permanent injunction and attorney's fees, but before the post-trial motions. We find the comments do not show a bias which would require removal or disqualification. They relate to the effect of the decision on the campground members. Although unfortunate, the trial judge reasonably explained that he believed there were no further issues remaining.

## DECISION

Affirmed.

FORSBERG, J., dissents.

FORSBERG, Judge (dissenting).

I respectfully dissent. The settlement stipulation does not prohibit the conduct enjoined. The stipulation expressly restricts the number of campsites allowed at the Whitebirch property, not the use of the property. A determination that the stipulation restricts the use of the property is contrary to the rule governing interpretation of restrictions on the free use of property. In *Costley v. Caromin House Inc.*, 313 N.W.2d 21 (Minn.1981), the Minnesota Supreme Court stated:

> Restrictive covenants are strictly construed against limitations on the use of property. * * * Since the law favors the unrestricted use of property, courts will not adopt a strained construction in favor of restrictions.

*Id.* at 26 (citing *Mission Covenant Church v. Nelson,* 253 Minn. 230, 233, 91 N.W.2d 440, 442 (1958)). Any doubts should be resolved in favor of the unrestricted use of property. *Mission Covenant Church*, 253 Minn. at 233, 91 N.W.2d at 442.

The language of the stipulation is permissive, providing that Whitebirch *"may develop and sell not more than 750 campsites * * *."* If the parties intended to restrict the rate of occupancy, they could have provided for this in the stipulation. Instead, the parties limited the number of campsites from the proposed 3000 to 750. Whitebirch should thus be entitled to the full benefit of the 750 campsites 365 days of the year.