# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2769

_____

Michael Mapes,                    *
                                  *
    Plaintiff - Appellee,         *
                                  *  Appeal from the United States
v.                                *  District Court for the
                                  *  District of Minnesota.
MTR Gaming Group, Inc.,           *
                                  *
    Defendant - Appellant.        *

_____

Submitted:  May 17, 2002

Filed: August 8, 2002

_____

Before LOKEN, HEANEY, and MURPHY, Circuit Judges.

_____

LOKEN, Circuit Judge.

Michael Mapes was a founder and substantial shareholder of Golden Palace Casinos, Inc.  The predecessor of MTR Gaming Group, Inc. ("MTR"), acquired Golden Palace through a stock exchange agreement, and Mapes later sued the acquirer for breach of that agreement.  On June 30, 1995, the parties settled the lawsuit by entering into a Settlement Agreement.  One year later, MTR refused to execute and deliver a promissory note, and Mapes commenced this diversity action alleging breach of the Settlement Agreement.

Applying Minnesota law, the district court[1] granted summary judgment in favor of Mapes, concluding the Settlement Agreement unambiguously supports his claim. MTR appeals. We review the district court's interpretation of the contract and the grant of summary judgment de novo. See State by Crow Wing Env't Prot. Ass'n, Inc. v. City of Breezy Point, 363 N.W.2d 778, 781 (Minn. App. 1985). "Unambiguous contract language must be construed according to its plain and ordinary meaning." Buchwald v. Univ. of Minnesota, 573 N.W.2d 723, 726 (Minn. App. 1998); see Telex Corp. v. Data Prods. Corp., 135 N.W.2d 681, 686-87 (Minn. 1965). We conclude the district court correctly construed the Settlement Agreement and therefore affirm.

Under the Settlement Agreement, MTR's predecessor issued to Mapes 120,000 restricted, unregistered "Make-Up Shares" of common stock, "based on a value of $1.50 per share." The Agreement provided that, if MTR failed to register the Make-Up Shares by June 30, 1996 "for whatever reason," MTR must execute and deliver a promissory note in the amount of $180,000. In March 1996, Mapes sold the Make-Up Shares in a transaction exempt from federal registration requirements to Robert Haskell, a potential buyer known to the parties when the Settlement Agreement was signed. Thereafter, MTR failed to register its common stock by the June 30 deadline, but took the position that Mapes's sale to Haskell extinguished MTR's obligation to execute and deliver a promissory note. Mapes sued, arguing that the sale simply reduced MTR's note obligation by the $48,000 he received from Haskell. To resolve this issue, like the district court we begin with the relevant Settlement Agreement provisions, highlighting those we find most critical to the question at hand:

> 4(b) Restricted Securities. Mapes understands and acknowledges that, until registered, the shares of common stock to be issued under this Settlement Agreement are restricted securities and are being acquired by Mapes for his own account . . . for investment purposes and not for

[1]The HONORABLE MICHAEL J. DAVIS, United States District Judge for the District of Minnesota.

distribution. . . . Mapes and [MTR] acknowledge that Mapes intends to sell 35,000 shares of the common stock in a transaction intended to be exempt from the registration requirements of the [Securities] Act.

4(c) Exempt Transactions. *In the event Mapes sells any of the Make-Up Shares prior to the effective date of the registration statement in a transaction exempt from the Act's registration requirements, then [MTR] shall receive a credit against the Note (if such Note is required to be executed and delivered pursuant to Section 6 below) in an amount equal to the actual purchase price of such shares, up to $1.50 per share multiplied by the number of shares sold.*

5. Registration of Shares. [MTR] will use its best efforts to cause a registration statement to become effective with the Securities and Exchange Commission by June 30, 1996 (the "Registration Statement"). Such Registration Statement shall include the Make-Up Shares, the Expense Shares, and up to 20,000 of the Option Shares, provided such inclusion is not prohibited by applicable law. . . .

6. Execution of Promissory Note. *If the Registration Statement does not become effective by June 30, 1996, for whatever reason, then [MTR] shall execute and deliver to Mapes a promissory note [in the amount of $180,000].*

7. Issuance of Additional Shares. If the average closing market price of [MTR's] common stock for the ninety (90) trading days immediately following the effective date of the Registration Statement is less than $1.50 per share, then [MTR] shall issue Mapes that number of additional shares required to satisfy the difference between $1.50 per share and such average market price (the "Additional Shares"). [This provision] shall apply only to the Make-Up Shares.

10. Right of Repurchase. *After the execution and delivery of the Note, [MTR] shall have the right to repurchase the Make-Up Shares at a price of $1.50 per share. . . . [A]t any time, Mapes may, at his election . . . extinguish the right of repurchase*, as to any or all of the Make-Up Shares. In such event, [MTR] will receive a credit against the Note in

an amount equal to $1.50 multiplied by the number of shares as to which the right of repurchase has been extinguished.

Like the district court, we conclude that the plain language of section 6 of the Settlement Agreement required MTR to issue a promissory note if it did not register the Make-Up Shares by June 30, 1996 "for whatever reason," whereas section 4(c) permitted Mapes to sell the Make-Up shares in an exempt transaction before the June 30 registration deadline. Nothing in the Agreement suggests that a pre-registration sale under section 4(c) extinguished MTR's duty to execute and deliver the promissory note if it later failed to register the Make-Up Shares. Indeed, section 4(c) is to the contrary, expressly providing that MTR shall receive a credit against the Note equal to the sale proceeds "if such Note is required to be executed and delivered pursuant to Section 6 below." That credit was included in the amount Mapes claimed for MTR's failure to execute and deliver the note ($180,000 minus $48,000). The district court properly granted him summary judgment on that claim.

MTR argues that a pre-registration sale of the Make-Up Shares must be construed as extinguishing MTR's promissory note obligation because section 10 of the Settlement Agreement gave MTR the right to repurchase the Make-Up Shares at a price of $1.50 after the note was executed and delivered. For this repurchase right to achieve its intended purpose, paragraph 4(c) must be construed as permitting Mapes to sell the Make-Up Shares before June 30, 1996, but only by forfeiting his right to the promissory note if those shares were not later registered.[2] We agree the parties could have designed their agreement in this fashion, but they did not. Section 4(c) instead expressly provides that a pre-registration sale results in a credit against the note "if such Note is required to be executed and delivered." That is plainly

---

[2]An affidavit by an officer and attorney for MTR avers that Haskell extinguished MTR's right to repurchase after buying the Make-Up Shares from Mapes. In our view, this is irrelevant because section 10 expressly grants only Mapes a right to extinguish MTR's right to repurchase under the Settlement Agreement.

inconsistent with the contention that a pre-registration sale *extinguished* MTR's future obligation to execute and deliver the note.

In this regard, the plain language of section 4(c) no doubt made the agreement more favorable to Mapes. But construing that section in accordance with its plain meaning does not produce an absurd result, as MTR suggests. The parties' intent may well have been to (i) provide Mapes a guaranteed settlement of $180,000, (ii) use registration to fund the settlement but allow Mapes to get some cash early if he could make an exempt transaction sale, (iii) if the Make-Up Shares could not be registered, use a promissory note to further defer MTR's obligation to fully fund the settlement, and (iv) allow Mapes to extinguish MTR's right to repurchase if the Make-Up Shares appreciated in value after the note was executed and delivered. In these circumstances, our task is simply to "determine the meaning of the contract in accordance with its plainly expressed intent." Wessels, Arnold & Henderson v. National Medical Waste, Inc., 65 F.3d 1427, 1436 (8th Cir. 1995) (applying Minnesota law). Thus, we will enforce section 4(c) as written.

Finally, MTR argues that the district court made an arithmetic error in determining the amount of its judgment, awarding Mapes $138,000 instead of $132,000 ($180,000 minus the $48,000 credit). MTR then goes on to complain that the district court did not limit its award of damages to 12% "simple interest," and failed to deduct a ninety-day credit, as the terms of the promissory note required. These issues were noted briefly in a footnote in MTR's main brief and then discussed at greater length in its reply brief. In response to a question at oral argument, counsel for MTR said these issues were raised in the district court by a motion to reconsider,

but no such motion appears in the district court docket entries, nor was it included in the appendix on appeal.  We conclude the issues were not properly preserved. Accordingly, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.