## United States Court of Appeals
### For the Eighth Circuit
No. 19-2837

Bruce Hampton

*Plaintiff - Appellant*

v.

Michael Kohler

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 21, 2020
Filed: February 23, 2021

_____

Before SMITH, Chief Judge, LOKEN and GRUENDER, Circuit Judges.

_____

LOKEN, Circuit Judge.

Bruce Hampton sued Michael Kohler, former president of Milestone Systems, Inc., for refusing to pay Hampton his pro-rata share of "Post-Closing Amounts" paid by Kudelski Security, Inc. ("Kudelski") pursuant to its April 2016 cash purchase of

Milestone's outstanding stock. The district court[1] granted Kohler summary judgment, concluding that Hampton, though a former Milestone shareholder, is not eligible for a post-closing payment under unambiguous contract provisions. Hampton appeals, arguing the district court misinterpreted the relevant contracts. The key issue is whether Hampton is eligible to receive a share of the Post-Closing Amounts because Kudelski terminated his employment "without cause (as described in Employee's employment agreement)" shortly before Kudelski paid the Post-Closing Amounts to Kohler, the agreed-upon "Selling Shareholder." We review the district court's interpretation of the contracts and the grant of summary judgment *de novo*. Mapes v. MTR Gaming Group, Inc., 299 F.3d 706, 707 (8th Cir. 2002). We affirm.

## I. Background

Milestone hired Hampton as an information technology expert in 2002. Under an Employment Agreement (the "EA") and a related Restricted Stock Agreement, Hampton received 760 shares of restricted Series B Milestone stock, later increased to 1,465 shares in a 2005 amendment. On April 29, 2016, for the stated purpose of satisfying a condition of the purchaser in an impending stock acquisition, Hampton and Milestone entered into a Termination and Release Agreement (the "TRA") which terminated Hampton's Restricted Stock Agreement in exchange for Milestone agreeing to pay him the Closing Amount "that would otherwise have been payable at the Closing." On the same day, Hampton and Kohler as Selling Shareholder entered into an Agreement with Respect to Post-Closing Amounts (the "PCA") concerning $4 million of the total stock purchase price that Kudelski would hold in escrow pending determination of unrealized Milestone liabilities. Pursuant to the TRA, Hampton received $1,368,641 at the closing.

---

[1]The Honorable Donovan W. Frank, Senior United States District Judge for the District of Minnesota.

The PCA provided that Kohler would pay Hampton his pro rata share of all Post-Closing Amounts as if his Restricted Stock Agreement had not been terminated, subject to the following provisions:

> 3.  Payment Conditioned on Employment.  In order for an Employee to receive its pro rata portion of any Post-Closing Amounts, the Employee must be employed by the Company at the time of Payment.  Notwithstanding the foregoing, however, an Employee remains eligible to receive its pro rata portion of the Post-Closing Amounts (if any) if the Company terminates the Employee's employment without cause (as described in Employee's employment agreement).

> 5.  Entire Agreement. The parties hereto understand and agree that the terms of the Agreement supersede any prior discussions, understandings or agreements between or among them relative to the subject matter hereof, and that the terms of this Agreement are intended to constitute a binding contract between and among them for their express benefit, and for the benefit of the [Milestone] Purchaser.

Hampton's 2002 EA included the following termination provisions:

> 16.)  Termination. This Agreement may be terminated as follows:
> (a)  Immediately upon the mutual consent of MILESTONE and Employee;
> (b)  Upon the expiration of thirty (30) days following the date on which MILESTONE or Employee shall give to the other written notice of intention to terminate without cause. MILESTONE reserves the right to provide Employee thirty days' pay in lieu of notice . . . .

Hampton continued to work for Kudelski following its acquisition of Milestone's stock, initially performing the same duties. In mid-July 2016, Hampton was informed he would be reassigned to an "individual contributor position" at Kudelski that would include frequent travels to Europe and elsewhere to "teach[]

other engineers what made Milestone successful." Hampton complained to Kudelski's chief operating officer, Steve Speidel, that extended travel would interfere with family obligations in Minnesota. Speidel did not want Hampton to leave, particularly before Hampton secured a two-part renewal of a major client set to occur in September 2016 and February 2017. Speidel told chief executive officer Rich Fennessy that "[Hampton] is thinking about wanting to do something different."

After a July 20 meeting between Hampton and Fennessy, attorneys for Kudelski and Hampton negotiated the terms of a Confidential Separation Agreement and General Release of All Claims (the "SA"), which the parties signed in late August 2016. The SA recited that "Kudelski wishes to reach an amicable separation with [Hampton] and to assist [Hampton's] transition to other employment." It provided that Hampton's employment would end September 30, 2016; that he would receive a $37,500 severance payment, continued group health benefits through 2016, and a "bonus payout" for the major client renewal; and that he would use his best efforts until April 30, 2017 to perform additional customer assistance requested by Kudelski as an independent contractor for $200 per hour plus expenses. The SA included detailed covenants not to compete and confidentiality provisions, and an Entire Agreement provision regarding the separation. It expressly stated, "The parties' separation is without cause by either party." After the separation, Hampton created a new business that does not compete with Kudelski.

Hampton wrote Kohler in October of 2017 requesting his pro-rata share of the Post-Closing Amounts Kudelski was about to pay. Kohler's counsel responded that Hampton was not entitled to a payment because he was neither employed by Kudelski nor terminated by Kudelski without cause. Kudelski paid the Post-Closing Amounts to Kohler as Selling Shareholder and Kohler paid pro rata shares to eligible former shareholders other than Hampton in mid-November. This lawsuit followed. After dismissing other claims not at issue on appeal, the district court granted summary judgment dismissing Hampton's claim that Kohler breached the PCA by failing to

-4-

pay Hampton his pro rata share of the Post-Closing Amounts, alleged to be approximately $159,000. The court concluded that Hampton was not entitled to payment under the unambiguous provisions of Section 3 of the PCA. It is undisputed that Hampton was not employed by Kudelski when Kohler received the Post-Closing Amounts. The issue is whether Hampton was nonetheless eligible because Kudelski terminated his employment "without cause (as described in [the EA])."

## II. Discussion

Under Minnesota law, which governs this diversity action, "[i]nterpretation of unambiguous contracts is a question of law for the court, as is the determination that a contract is ambiguous." Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc., 913 N.W.2d 687, 692 (Minn. 2018). "The terms of a contract are ambiguous if they are susceptible to more than one reasonable interpretation. A contract's terms are not ambiguous simply because the parties' interpretations differ." Id. The Supreme Court of Minnesota "look[s] to the language of the contract to determine the parties' intent." Storms, Inc. v. Mathy Const. Co., 883 N.W.2d 772, 776 (Minn. 2016). That intent "is ascertained, not by a process of dissection in which words or phrases are isolated from their context, but from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract as a whole." Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc., 666 N.W.2d 320, 324 (Minn. 2003) (cleaned up). In applying Minnesota law, we "give unambiguous words their plain, ordinary, and popular meaning; read contract provisions in context with all other relevant provisions; and use common sense in interpreting language." Luis v. RBC Capital Markets, LLC, 984 F.3d 575, 579 (8th Cir. 2020) (cleaned up).

At issue is whether Section 3 of the PCA entitled Hampton to receive a share of any Post-Closing Amounts paid by Kudelski to Milestone's former shareholders. Kohler and Hampton entered into the PCA the same day that Hampton and Milestone

entered into the TRA terminating Hampton as a Milestone shareholder but agreeing to pay him the amount "that would otherwise have been payable" when Kudelski purchased Milestone's outstanding stock for cash. In the PCA, Kohler promised to pay Hampton a comparable pro-rata share of any Post-Closing Amounts Kudelski paid to Kohler, provided that Hampton was "employed by [Kudelski] at the time of Payment," or if Kudelski "terminates [Hampton's] employment without cause (as described in [Hampton's EA]."

The district court concluded that the unambiguous PCA "was drafted in anticipation of a change in company ownership and management, and provided [Milestone's purchaser] assurances that crucial employees would stay on for the duration of a critical transition period." Hampton argues the district court "err[ed] by making this factual finding without evidence in the record . . . on the contracts' purpose and objects to be obtained." The PCA's purpose and object, he contends, can only be established by extrinsic evidence that may not be considered in interpreting an unambiguous contract. These contentions are without merit. The district court properly determined the object and purpose of the PCA from the plain language of the instrument itself. See Storms, 883 N.W.2d at 776 ("[T]he intent of the parties is determined from the plain language of the instrument."). In addition to the obvious evidence of purpose reflected in the simultaneous timing of the TRA and PCA agreements, Section 3 of the PCA was entitled "Payment Conditioned on Employment," and Section 5 expressly provided that the PCA was entered into "for the benefit of the [Milestone] Purchaser," Kudelski.

The issue on appeal turns on the meaning of the PCA term, "the Company terminat[ing] Employee's employment without cause (as described in Employee's employment agreement)." Hampton did not explicitly argue the district court erred in concluding Section 3 is unambiguous until the penultimate sentence of his lengthy Reply Brief: "The Post-Closing Agreement and Employment Agreement, are reasonably susceptible to more than one interpretation, which requires a trial to

-6-

resolve these issues." This failed to properly preserve the issue for our review. See Fed. R. App. P. 28(a)(5)-(8). But in any event, we agree with the district court that Section 3 of the PCA is unambiguous. The cross reference to "the Employee's employment agreement" clearly means Section 16 of Hampton's EA. Though the parties interpret the cross reference differently, the operative term in Section 3 -- that the company terminates an employee without cause -- is widely used in a variety of legal contexts and employs words that have a "plain, ordinary, and popular meaning."

Hampton's principal argument on appeal is that the cross reference to the termination provisions of the EA should be interpreted as including Section 16(a) -- the mutual consent provision -- as well as Section 16(b) -- the subsection that refers to termination "without cause." According to Hampton, a consensual termination is still a termination "by the company," and therefore the only difference between Sections 16(a) and 16(b) is timing -- the thirty-day notice provision in Section 16(b). Both provisions encompass terminations without cause by either party. Like the district court, we disagree. Section 3 of the PCA cross references the provision in the EA that "describes" the term "terminates . . . without cause." "When there is a reference in one instrument to the terms or provisions of a prior instrument, the prior instrument may be deemed a part of that second document to the extent of the reference to it." Winter v. Liles, 354 N.W.2d 70, 73 (Minn. App. 1984); see Short v. Van Dyke, 52 N.W. 643, 644 (Minn. 1892). The only provision in the EA that uses that term is Section 16(b). By contrast, Section 16(a) describes termination "upon the mutual consent of Milestone and Employee."

The remaining issue is whether, when Hampton's employment ended on September 30, 2016 pursuant to the SA, he was "terminated by Kudelski without cause." Referring to extrinsic evidence of both parties' conduct leading up to their entry into the SA, Hampton characterizes the separation as a mutual termination *initiated by Kudelski* and argues the district court resolved disputed material facts against the non-moving party in granting Kohler summary judgment. The district

court concluded that a "termination without cause" under Section 3 of the PCA must be "a scenario in which Hampton's employment is ended by the action of one party, and further requires that the party taking that decision is *not* Hampton." We agree with this interpretation. The SA of course ended (terminated) Hampton's employment, but by its express terms it was not a termination by "the company . . . without cause." It was "an amicable separation . . . to assist [Hampton's] transition to other employment." Moreover, Section 5 of the PCA expressly provided that the parties "understand and agree that the terms of the Agreement supersede any prior discussions, understandings or agreements between or among them relative to the subject matter hereof." Interpreting the plain language of the EA, the PCA, and the SA read together, no reasonable factfinder could find that Hampton was terminated by Kudelski without cause. See Fed. R. Civ. P. 56(a).

Finally, Hampton argues the district court erred in concluding that his failure to satisfy the condition precedent in Section 3 of the PCA was a material breach, rather than a "disproportionate forfeiture" under Section 229 of the Restatement (Second) of Contracts as applied in Capistrant v. Lifetouch National School Studios, Inc., 916 N.W.2d 23, 28-30 (Minn. 2018). We disagree. The Court in Capistrant noted that the general rule is that "conditions precedent are always material" because "if the event required by the condition does not occur, there is no breach of contract," and that it usually "resolve[s] cases involving conditions precedent as a matter of law." Id. at 27-29 (quotation omitted). In addressing the disproportionate-forfeiture issue, the first question is "whether the occurrence of the condition was a material part of the agreed exchange." Id. at 29. "[I]f the occurrence of the condition is a material part of the agreement, then the proportionality analysis is not applied and the forfeiture cannot be prevented." Id. Here, Kohler supported his motion for summary judgment with evidence, consistent with the unambiguous terms of Section 3, that he would not have entered into the agreements without a requirement that Hampton remain in Kudelski's employ up to the time Post-Closing Amounts were paid. Hampton submitted argument to the contrary but no supporting *evidence*. On this

record, the district court correctly concluded, as a matter of law, that Hampton's failure to meet the requirements of Section 3 was a material breach of an unambiguous term of the contract. Indeed, it was the term that triggered Kohler's promise to perform his PCA obligation to pay Hampton a Post-Closing Amount. Thus, the district court properly applied the general rule in this case.

The judgment of the district court is affirmed.

_____